No. 24-5549

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**
_____

Thomas Michael Smith and Monaleto Sneed,
*Plaintiffs – Appellants,*

v.

PAM Transport, Inc.,
*Defendant – Appellee.*

**On Appeal from the United States District Court
for the Middle District of Tennessee**
_____

**BRIEF OF APPELLANTS
THOMAS MICHAEL SMITH and MONALETO SNEED**
_____

Douglas B. Janney III (TN BPR No. 19112)
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

Stephen W. Grace (TN BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee 37212
(615) 255-5225
sgrace@sgracelaw.com

*Counsel for Appellants
Thomas Michael Smith and Monaleto Sneed*

---

## CORPORATE DISCLOSURE

Pursuant to 6 Cir. R. 26.1, Thomas Michael Smith and Monaleto Sneed make the following disclosures:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation? No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  No.


s/Douglas B. Janney III                          October 4, 2024
Douglas B. Janney III                            Date

# TABLE OF CONTENTS

Corporate Disclosure Statement ……………………………………………..…i

Table of Contents …………………………………………………………….……ii

Table of Authorities ………………………………………………..................iv

Statement in Support of Oral Argument ……………………………………...viii

Statement of Jurisdiction ……..………………………………....………………1

Statement of Issues ….…..…..……………………………………………....…2

Statement of the Case ………………………………………………………...3

Summary of the Argument ……………………………………………………18

Argument …………………………………………………………..............20

      I.    Standard of Review ……………………………………….........20

      II.   The District Court Incorrectly Dismissed Plaintiffs' Hostile Work Environment Claims ……………………………..……………….20

           A.   The Harassment was Based on Race ……………………......21

                1.   Discriminatory conduct and treatment ………………...21

                2.   Discriminatory and abusive comments and behavior …30

           B.   The Harassment was Severe and/or Pervasive ………………37

           C.   PAM is Liable ……………………………………..………45

Conclusion ………………………………………………………..............52

Certificate of Compliance …………………………………………….…..53

Certificate of Service …………………………………………………....53

Addendum …………………………………………………………………………..54

# TABLE OF AUTHORITIES

## Cases

*Abeita v. TransAmerica Mailings, Inc*., 159 F.3d 246 (6th Cir. 1998) ……………43

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ………………………………20

*Bard v. Brown County*, 970 F.3d 738 (6th Cir. 2020) ………………………………...25

*Barrett v. Whirlpool Corp*., 556 F.3d 502 (6th Cir. 2009) …………………………21

*Boyer-Liberto v. Fontainebleau Corp*.,
   786 F.3d 264 (4th Cir. 2014) (en banc) …………………………………………..32

*Bradley v. Arwood*, 705 Fed. Appx. 411 (6th Cir. 2017) …………..22-23, 28, 43-44

*Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998) ………………………….......41, 46

*Castleberry v. STI Grp*., 863 F.3d 259 (3d Cir. 2017) ………………………………..41

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ………………………….....…………25

*Chattman v. Toho Tenax Amer., Inc*., 686 F.3d 339 (6th Cir. 2012) ………………..21

*Clark v. UPS*, 400 F.3d 341 (6th Cir. 2005) ………………………………….45-47, 51

*Clay v. United Parcel Serv., Inc*., 501 F.3d 695 (6th Cir. 2007) …………...22-23, 30

*Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co*.,
   497 F.3d 1135 (10th Cir. 2007) ……………………………………………………29

*Ejikeme v. Violet*, 307 Fed. Appx. 944 (6th Cir. 2009) ……………………………..33

*El-Scari v. Comprehensive Mental Health Servs*., 2019 U.S. Dist. LEXIS
   181882, 2019 WL 5386489 (W.D. Mo. Oct. 21, 2019) …………………….27

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) …………………………...40, 46

*Gallagher v. C.H. Robinson Worldwide, Inc.*,

567 F.3d 263 (6th Cir. 2009) ……………………………………………39, 51

*Green v. Brennan*, 578 U.S. 547 (2016) ………………………………………...38

*Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903 (8th Cir. 2006) ……...32

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993) ………………………….......5, 37

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) …………..…..36, 41

*Ierardi v. Lorillard, Inc.*, 1991 WL 66799 (E.D. Pa. Apr. 15, 1991) ………………30

*Johnson v. Ford Motor Co.*, 13 F.4th 493 (6th Cir. 2021) …………….…..21, 37-40, 44

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000) …………………….…21

*Johnson v. UPS*, 117 Fed. Appx. 444 (6th Cir. 2004) …………………………36, 41

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) …………………...32

*LaPlante v. City of Battle Creek*, 30 F.4th 572 (6th Cir. 2022) ……………………20

*McNeal v. City of Blue Ash*, ___ F.4th ___, 2024 U.S. App. LEXIS
    24123 (6th Cir. Sept. 23, 2024) …………………………….29, 34, 39-40, 44

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) …………………..39

*QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676 (S.D. Fla. 2012) ………………..30

*Rembert v. Swagelok Co.*, 2023 U.S. App. LEXIS
    10333 (6th Cir. Apr. 26, 2023) …………………………………………..40

*Scaife v. U.S. Dep't of Veterans Affairs*, 49 F.4th 1109 (7th Cir. 2022) …………...41

*Schlosser v. VRHabilis, LLC*, ___ F.4th ___, 2024 U.S. App. LEXIS
    21523 (6th Cir. Aug. 26, 2024) ……………………………………38, 42

*Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325 (W.D. Ky. 2022) …………………....30

*Scott v. Harris*, 550 U.S. 372 (2007) ……………………………………………32

*Smith v. Rock-Tenn Servs.*, 813 F.3d 298 (6th Cir. 2016) …………….....................37

*Spriggs v. Diamond Auto Glass*, 242 F.3d 179 (4th Cir. 2001) ……………………33

*Waldo v. Consumers Energy Co.*, 726 F.3d 802 (6th Cir. 2013) …………….............22

*West v. Tyson Foods, Inc.*, 374 Fed. Appx. 624 (6th Cir. 2010) …………………...51

*Williams v. CSX Transp. Co.*, 643 F.3d 502 (6th Cir. 2011) …………………..21, 33

*Williams v. GMC*, 187 F.3d 553 (6th Cir. 1999) …………………………...38-39, 43

*Woods v. Cantrell*, 29 F.4th 284 (5th Cir. 2022) ………………………………….40

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) …………………...25-26

**Statutes**

28 U.S.C. § 1291 …………………………………………………………………...1

28 U.S.C. § 1331 …………………………………………………………………...1

42 U.S.C. § 1981 ………………………………………………………...1, 3-4, 21

42 U.S.C. § 2000e, *et seq.* …………………………………………………1, 3-4, 21

Tenn. Code Ann. § 4-21-101, *et seq.* ………………………………………1, 3-4, 21

**Rules**

Fed. R. Civ. P. 56 ………………………………………………………….........20

Fed. R. Evid. 801(d)(2) …………………………………………………………...24

Fed. R. Evid. 803(3) ……………………………………………………………….24

Fed. R. Evid. 807(a) ……………………………………………………………....24

**Other Authority**

2 McCormick on Evidence § 249 (7th ed. 2013) …………………………………24

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellants Thomas Michael Smith and Monaleto Sneed respectfully request that the Court grant oral argument.  Respectfully, in granting Appellee PAM Transport, Inc.'s motion for summary judgment, the district court failed to consider evidence of discriminatory conduct and treatment establishing genuine issues of material fact as to Smith's and Sneed's hostile work environment claims; improperly viewed evidence of discriminatory and abusive comments and behavior in the light most favorable to PAM Transport; and failed to properly apply the law to the facts of the case.  Counsel will be able to assist the Court in identifying and addressing these issues and answering questions the Court may have at oral argument.

## STATEMENT OF JURISDICTION

This is an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. ("THRA").  The district court had jurisdiction under 28 U.S.C. § 1331. Appellants Smith and Sneed (collectively "Plaintiffs") appeal its May 9, 2024, final judgment order granting Appellee PAM Transport, Inc. ("PAM Transport" or "PAM")'s motion for summary judgment. (RE 44, Order, Page ID # 1032). Plaintiffs filed a notice of appeal on June 7, 2024. (RE 46, Notice of Appeal, Page ID # 1034).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

Whether the district court incorrectly granted PAM Transport's motion for summary judgment and dismissed Smith's and Sneed's hostile work environment claims where Smith and Sneed presented evidence of continuous discriminatory treatment, comments, and behavior by their supervisors that a reasonable jury could find to have been motivated by Smith's and Sneed's race and sufficiently severe or pervasive to create a hostile work environment.

# STATEMENT OF THE CASE

## I.    Procedural History

Sneed filed his race discrimination, hostile work environment, and retaliation claims in this case under Title VII, § 1981, and the THRA, and Smith filed the same claims under § 1981, in the district court on March 26, 2021. (RE 1, Compl., Page ID # 1-6).  The parties engaged in discovery and took the depositions of Plaintiffs and PAM's Fed. R. Civ. P. 30(b)(6) designated corporate representative. (RE 33-1 – 33-6, Deposition Transcripts and Exhibits, Page ID # 401-880).  On May 9, 2022, PAM filed a motion for summary judgment and supporting materials. (RE 24, Motion, Page ID # 157-59; RE 25, Memorandum, Page ID # 160-80; RE 26, Statement of Facts, Page ID # 301-14).  On June 6, 2022, Plaintiffs filed a response and supporting materials. (RE 31, Response, Page ID # 349-72; RE 32, Resp. Stmt. Facts and Stmt. Add'l Facts, Page ID # 373-98; RE 33 – 33-6, Notice of Filing and Materials, Page ID # 399-880).  On June 13, 2022, PAM filed a reply and a response to Plaintiffs' statement of additional facts. (RE 39, Reply, Page ID # 930-37; RE 37, Resp. Stmt. Add'l Facts, Page ID # 900-20).

On May 9, 2024—*two years* after PAM filed its motion[1]—the district court entered a memorandum and order granting PAM's motion for summary judgment

---

[1] Respectfully, the district court frequently takes excessive amounts of time to rule on motions, which can be substantially prejudicial to parties and unreasonably delay         the         public's         access         to         justice.         *See*

3

and dismissing all of Plaintiffs' claims. (RE 43, Mem. Opin., Page ID # 943-1031;
RE 44, Order, Page ID # 1032).  Plaintiffs timely filed a notice of appeal. (RE 46,
Notice App., Page ID # 1034-35).  They appeal the dismissal of their hostile work
environment claims under Title VII, § 1981, and the THRA.  They abandon their
discrimination and retaliation claims under those statutes.

## II.    Background

PAM is a trucking company with approximately 2,600 employees. (RE 33-4,
Wright Dep. 11, Page ID # 850).[2]  Smith and Sneed are African Americans who
were employed by PAM as truck drivers dispatched out of its Whites Creek location
in Nashville, Tennessee. (RE 33-1, Smith Dep. 31-32, Page ID # 431-32; RE 33-2,
Sneed Dep. 65, Page ID # 575; RE 33-4, Wright Dep. 11, 16, Page ID # 850-51).
Smith served as a local driver from October 24, 2018, through April 23, 2019. (RE
33-4, Wright Dep. 13, Page ID # 851; RE 33-1, Smith Dep. 32, Page ID # 432).
Sneed began as an over-the-road driver on February 8, 2019, and later became a
local driver until PAM discharged him on April 16, 2020. (RE 33-4, Wright Dep.
45-46, Page ID # 859; RE 33-2, Sneed Dep. 68-69, Page ID # 578-79).

---

https://www.uscourts.gov/sites/default/files/data_tables/cjra_8_0331.2024.pdf    at
1171-72.

[2] PAM's Director of HR Administration, Holly Wright, served as its Fed. R.
Civ. P. 30(b)(6) designated corporate representative and testified on its behalf. (RE
33-4, Wright Dep. 6, 9, Page ID # 849-50).

When they began their employment with PAM, Plaintiffs participated in driver orientation in a classroom setting with between 10 and 20 other drivers who were "mostly white," with approximately three African Americans, including Plaintiffs. (RE 33-1, Smith Dep. 25-27, Page ID # 425-27; RE 33-2, Sneed Dep. 55-56, Page ID # 565-66; RE 33-4, Wright Dep. 51, Page ID # 860). In 2019 and 2020, 10 to 15 drivers worked out of the Whites Creek location, including Plaintiffs; Jason, who is from Iran or Iraq; Melvin, who is white; and Chris, who is white. (RE 33-4, Wright Dep. 12, 44-45, Page ID # 850, 858-59; RE 33-1, Smith Dep. 31, 43-44, Page ID # 431, 443-44; RE 33-2, Sneed Dep. 66-67, Page ID # 576-77).

## III.   PAM's Discriminatory, Hostile and Abusive Treatment of Plaintiffs

During their employment with PAM, Plaintiffs experienced a racially hostile and abusive work environment that included a variety of discriminatory treatment, comments, and verbally abusive behavior by their supervisors, Driver Manager / Dispatcher Jermaine Davis, who is African American, and Davis' supervisor, Operations Manager Jordan Claytor, who is Caucasian. (RE 33-1, Smith Dep. 39-40, 51, Page ID # 439-40, 451; RE 33-2, Sneed Dep. 64-65, Page ID # 574-75; RE 33-4, Wright Dep. 13-15, 47, 62-63, Page ID # 851, 859, 863). PAM advised Smith when it hired him that his work schedule was from between 6:00 and 7:00 a.m. to 3:00 p.m. (RE 33-1 Smith Dep. 33, Page ID # 433). But he often had to work later, resulting in his being unable to pick up his daughter from her afternoon school bus

stop as planned. (RE 33-1, Smith Dep. 32-34, Page ID # 432-34).  PAM advised Sneed when it hired him that his work schedule was 7:00 a.m. to 3:00 or 4:00 p.m. (RE 33-2, Sneed Dep. 69, Page ID # 579).  After he started working, however, his days were much longer than that, often starting at 7:00 a.m. and finishing from 7:00 to 9:00 p.m. (*Id*. at 70, Page ID # 580).

PAM assigned Plaintiffs heavier workloads and required them to work longer days and more and longer driving routes than their non-African American counterparts.  This resulted in Plaintiffs receiving less pay per hour for their work than non-African American drivers. (RE 33-1, Smith Dep. 33-35, 46, 52-53, 68-69, 71-73, 76, Page ID # 433-35, 452-53, 468-69, 471-73, 476; RE 33-2, Sneed Dep. 90, 95-97, 123-24, 133, 136-38, 146-47, 150, Page ID # 600, 605-07, 633-34, 643, 646-48, 656-57, 660).  All local drivers were paid $180 per day regardless of how many hours they worked. (RE 33-1, Smith Dep. 52-53, Page ID # 452-53; RE 33-2, Sneed Dep. 120-21, Page ID # 630-31; RE 33-4, Wright Dep. 20-21, Page ID # 852-53).

Smith worked about 70 hours per week. (RE 33-1, Smith Dep. 38, 49, Page ID # 438, 449).  Three to four times per week, PAM required him to run more than one load per day. (*Id*. at 52, Page ID # 452).  The routes PAM assigned Smith were "way longer" than those it assigned to "the white drivers." (*Id*. at 68-69, Page ID # 468-69).

Sneed observed that local driver Melvin, who is white, "only had to do one load" per day to Horse Cave, Kentucky. Meanwhile Sneed often had to drive two loads per day to Horse Cave. (RE 33-2, Sneed Dep. 90-91, Page ID # 600-01). Horse Cave is a two-hour drive one-way from the Whites Creek location, excluding traffic delays, accidents, and inclement weather. (*Id*. at 90-91, 117, 122, Page ID # 600-01, 627, 632). Davis was "running the clock out" on Sneed and having him "illegally driving" more hours per day than the law allowed while not doing this to non-African American drivers. (*Id*. at 95-98, 108-10, 115-178 Page ID # 605-08, 618-20, 625-28).

Sneed observed and discussed with managers and co-workers the fact that non-African American drivers at the Whites Creek location "would go home and I would have another trip to Horse Cave where they would get in their trucks or their cars and go home." (*Id*. at 136, Page ID # 646). He also observed and discussed non-African American drivers receiving shorter, more desirable routes than African American drivers, such as to nearby Clarksville, Tennessee, and Mt. Juliet, Tennessee. (*Id*. at 146-47, Page ID # 656-57). Sneed testified, "If I'm having to work full days and they're only working half a day getting paid the same, their hourly

rate is higher than mine. So they're only working 4 or 5 hours where I'm working 12" and "[t]hey got paid for a whole day." (*Id.* at 136-37, Page ID # 646-47).[3]

Sneed also discussed with white drivers Melvin and Chris, and supervisors Davis and Claytor, how white drivers received holiday pay and paid time off while he did not. (*Id.* at 128-30, 143-44, Page ID #638-40, 653-54). PAM further assigned Plaintiffs and other African American drivers older, damaged, and less desirable trucks with more miles on them than it assigned non-African American drivers. (RE 33-1, Smith Dep. 37, 63-65, 72, 76, Page ID # 437, 463-65, 472, 476; RE 33-2, Sneed Dep. 78-82, 138, 141, Page ID # 588-92, 648, 651). Sneed's truck "was the oldest truck" while non-African American drivers he observed "had brand new trucks." (RE 33-2, Sneed Dep. 78-80, Page ID # 588-90). PAM did not know how trucks were assigned. (RE 33-4, Wright Dep. 36, Page ID # 856).

Moreover, Plaintiffs' supervisors, Davis and Claytor, repeatedly referred to them as "monkey" and "monkey ass" in a hostile and threatening tone and subjected them to other verbally abusive behavior to which they did not subject non-African

---

[3] Other African American employees who worked for PAM when Plaintiffs did also complained of race discrimination. On July 1, 2019, Caroletta Segers filed an EEOC Charge of race discrimination against it. On July 23, 2020, Terrance Hurd filed a lawsuit against PAM for race discrimination in which he alleged he "was denied the same benefits and terms and conditions of employment as similarly situated Caucasians and that he was terminated on account of his race and color in violation of 42 U.S.C. § 1981." (RE 37, Def's Resp. Stmt. Add'l Fact No. 32, Page ID # 919; Case No. 1:20-cv-00276, Doc. 4 at 1, ¶ 2 (N.D. Ind. Jul. 23, 2020)).

American drivers. (RE 33-1, Smith Dep. 46-48, 54-56, 95, Page ID # 446-48, 454-56, 495; RE 33-2, Sneed Dep. 153-55, Page ID # 663-65). Sneed testified that Claytor "used monkey, like [Davis]. Monkey ass, they used that." (RE 33-2, Sneed Dep. 155, Page ID # 665). Davis told Sneed, "[Y]ou're going to get your monkey A-S-S out there and do the job or . . . I'm going to write you up," among other threats toward him. (*Id.* at 153, Page ID # 663). Claytor's cussing and screaming at Sneed and calling him "monkey" and "monkey ass" was also "very disturbing." (*Id.* at 154-55, Page ID # 664-65).

Smith testified that Davis engaged in "'name calling.' Like the—he used the monkey—monkey A" and "call[ed] him outside of [his] name . . . like the monkey—the monkey ass." (RE 33-1, Smith Dep. 47, 54, Page ID # 447, 454). Davis threatened Smith, "[I]f you don't do this, you're going to get . . . terminated or not get paid. Or [if] you can't do the job, you don't need to be here" and "find another job." (*Id.* at 58, 74-75, Page ID # 458, 474-75).

In addition to the racial slurs, Davis and Claytor spoke to Plaintiffs in an extremely hostile and abusive manner. They cussed, screamed, criticized, belittled, talked down to, and threatened Plaintiffs with discipline and discharge. Plaintiffs heard, observed, discussed with managers, and testified about the manner in which Davis and Claytor spoke to and interacted with non-African American drivers. Plaintiffs noticed that they did not treat those drivers with hostility or discriminate

against them. (RE 33-1, Smith Dep. 46-48, 53-58, 76, 78, Page ID # 446-48, 453-58, 476, 478; RE 33-2, Sneed Dep. 125-26, 131-32, 152-55, Page ID # 635-36, 641-42, 662-65).    Plaintiffs further communicated with each other during their employment about how they were being discriminated against and harassed because of their race. (RE 33-1, Smith Dep. 43, 55-56, 65, 86, Page ID # 443, 455-56, 465, 486; RE 33-2, Sneed Dep. 165, Page ID # 675).

PAM's discriminatory and abusive treatment of Plaintiffs was ongoing and continuous throughout their employment.  Indeed, despite their repeated complaints about it, "[N]othing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 78-79, Page ID # 478-79; RE 33-2, Sneed Dep. 109-11, 119, Page ID # 619-21, 629).  Davis' and Claytor's discriminatory conduct, comments, and behavior interfered with Plaintiffs' job performance and made it more difficult for them to perform their jobs. (RE 33-1, Smith Dep. 56-59, Page ID # 456-59; RE 33-2, Sneed Dep. 132-35, Page ID # 642-45).  Smith testified, "[I]t slowed me down, because . . . when you're getting treated like that, you pretty much don't want to be at work. . . . My morale was down," which affected his ability to perform his job. (RE 33-1, Smith Dep. 56-57, Page ID # 456-57).  It was embarrassing, humiliating, and caused anxiety. (*Id.* at 95-97, Page ID # 495-97).  Sneed testified, "[I]t kills your morale. And it hurts your enthusiasm and it makes [it] where it's harder to do the job because . . . it puts you in a negative mind state . . . and brings on anxiety" and "has a direct

10

effect on the way I feel, the way my body feel[s], and how I perform on the road."
(RE 33-2, Sneed Dep. 132-34, Page ID # 642-44).

## IV.    Plaintiffs' Reports to PAM Management

Under PAM's Driver Manual and its Anti-Discrimination and Harassment
Policy, Plaintiffs were permitted to complain to "any manager" about the
discrimination and harassment they experienced. (RE 33-4, Wright Dep. 25, 35,
Page ID # 854, 856). The Driver Manual Preface also stated that concerns could be
brought "to the attention of the Driver Liaison, your Driver Manager, Operations
Manager, or the Driver Resources Department." (RE 33-3, Sneed Dep. Ex. 3 at 49,
Page ID # 764). Its Anti-Discrimination and Harassment Policy stated, "Drivers
who have concerns of harassment or who observe harassment should report such
conduct to a Supervisor, Driver/Fleet Manager, or HR. Reports will be promptly
investigated." (*Id*. at 53, Page ID # 768). PAM expected its managers to report any
complaints of discrimination or harassment to its Human Resources Department and
"instructed [them] that they are supposed to do that." (RE 33-4, Wright Dep. 35,
Page ID # 856).

Plaintiffs continuously opposed Davis' and Claytor's discriminatory conduct,
comments, and behavior throughout their employment. They repeatedly reported
and complained about it and "the intolerable work conditions and the race
discrimination" to Davis and Claytor as well as other managers, including former

11

Driver Liaisons James Brown (Smith and Sneed), Tyrone Luckett and Keith Coatney, and the Driver Liaisons' supervisor, former employee Fred Meek (Sneed). (RE 33-1, Smith Dep. 45-49, 54-56, 58-62, 64-65, 69-70, 72-75, 76-77, Page ID # 445-49, 454-56, 458-62, 464-65, 469-70, 472-75, 476-77; RE 33-2, Sneed Dep. 95-98, 104-113, 116-19, 137-42, 148-51, 172, 174-77, Page ID # 605-08, 614-23, 626-29, 647, 647-52, 658-61, 682, 684-87; RE 33-4, Wright Dep. 14-15, 59-63, Page ID # 851, 862-63). Driver Liaisons and their supervisors had authority to terminate drivers' employment. (RE 33-4, Wright Dep. 14, Page ID # 851).

Smith complained to Brown about the race discrimination and harassment multiple times by phone. (RE 33-1, Smith Dep. 45-49, 64-65, 76-77, Page ID # 445-49, 464-65, 476-77). Sneed complained to several managers in person, by phone, and through the Qualcomm system in the trucks. (RE 33-2, Sneed Dep. 107-13, 116-17, 119, 141-42, 174, 177, Page ID # 617-23, 626-27, 629, 651-52, 684, 687). He "tried to go up the chain of command as best [he] could" and "go through the proper channels." (*Id*. at 175-76, Page ID # 685-86). He "went through Jordan [Claytor], Jermaine [Davis], Fred [Meek] . . . all the way up to Keith [Coatney]." (*Id.* at 176, Page ID # 686). He further asked, "[I]s there anyone else who I can speak to? And [neither] Keith [Coatney] [n]or [any]body else would give [him] anyone else to help [him]." (*Id*. at 176-77, Page ID # 686-87).

Plaintiffs repeatedly reported to PAM management that they were being assigned heavier workloads and having to work longer days and drive more and longer routes than their non-African American counterparts, resulting in their receiving less pay per hour for their work. They complained "on numerous occasions," "several times," and "more than ten times" about the fact that the routes they were assigned were longer and took more time to complete than those assigned to non-African American drivers, and requested shorter routes. (RE 33-1, Smith Dep. 46-48, 69-70, 72-75, Page ID # 446-48, 469-70, 472-75; RE 33-2, Sneed Dep. 95-98, 104-05, 108-09, 115, 117, 136-37, 148, 150, Page ID # 605-08, 614-15, 618-19, 625, 627, 646-47, 658, 660). Smith complained to Brown about "the actual work load nobody else was getting outside of the African Americans. The longer day we was receiving" and the fact that non-African American drivers were working four hours per day for $180 while he was working 10 hours for the same rate. (RE 33-1, Smith Dep. 46, Page ID # 446).

Sneed complained to Davis, Claytor, Brown, Luckett, Coatney, "the lady in Safety," and Meek "several times" about having to take two loads to Horse Cave, Kentucky, and back in one day while non-African American drivers only had to take one load. He further complained to them about Davis "running the clock out" on him and having him "illegally driving" more hours per day than the law allowed. (RE 33-2, Sneed Dep. 90, 95-98, 103-05, 108-11, 115-17, Page ID # 600, 605-08,

613-15, 618-21, 625-27).   Sneed stated, "[A]re you discriminating [against] me because I'm black" and "Why am I constantly being asked" to "do two loads and other white drivers are not?" He never received any meaningful response. (*Id.* at 97-98, 108, Page ID # 607-08, 618).

Plaintiffs also repeatedly complained about Davis and Claytor using racially derogatory terms toward them, including "monkey" and "monkey ass," and their belittling and abusing them and threatening their continued employment. (RE 33-1, Smith Dep. 46-48, 54-56, 58, 74-75, Page ID # 446-47, 454-56, 458, 474-75; RE 33-2, Sneed Dep. 153-55, Page ID # 663-65).   Smith complained to Brown about the hostile "tone of voice" Davis and Claytor used with him and the threats of not being paid or being fired if he did not complete the discriminatory work assignments. (RE 33-1, Smith Dep. 47-48, Page ID # 447-48).   Plaintiffs also complained that they were being assigned older, damaged, and less desirable trucks than non-African American drivers. (RE 33-1, Smith Dep. 64, Page ID # 464; RE 33-2, Sneed Dep. 148-49, Page ID # 658-59).   They complained about not receiving job training equal to that which non-African American drivers received.  (RE 33-1, Smith Dep. 59-62, Page ID # 459-62; RE 33-2, Sneed Dep. 137-42, Page ID # 647-52).

## V.   PAM's Failure to Take Corrective Action

PAM never took any action in response to Plaintiffs' repeated complaints of race discrimination and harassment. (RE 33-1, Smith Dep. 77-78, Page ID # 477-78;

RE 33-2, Sneed Dep. 108-09, 119, 142, 176-77, Page ID # 618-19, 629, 652, 686-87).  It did not conduct any investigation at any time. (RE 33-4, Wright Dep. 36, 50, Page ID # 856, 860).  Smith complained "more than ten times" about "having to work more hours" than non-African American drivers.  Davis responded, "You get what you get," "That's part of it," and "Maybe you need . . . to find another job." (RE 33-1, Smith Dep. 70, 74-75, Page ID # 470, 474-75).

Brown responded to Smith that the discrimination "shouldn't be going on" and "[e]verybody should get the same treatment."  Brown advised Smith that he "would check into it," and "said he did," but "nothing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 64-65, 77-79, Page ID # 464-65, 477-79).  In response to Sneed's complaints, PAM's managers stated they "would look into" them but never followed up with him and "didn't do anything." (RE 33-2, Sneed Dep. 108-11, Page ID # 618-21).  As a result, the race discrimination and harassment continued and "kept going on" after Plaintiffs complained about it.  "Nothing was ever done," "It didn't get any better," and PAM "retaliated" against Plaintiffs for complaining about it. (RE 33-1, Smith Dep. 78-79, Page ID # 478-79; RE 33-2, Sneed Dep. 116, 119, 142, 156-57, 171-72, Page ID # 626, 629, 652, 666-67, 681-82).

## VI.    Smith's Constructive Discharge and Sneed's Discharge

PAM had a progressive discipline policy and practice, including using written warnings for drivers. (RE 33-4, Wright Dep. 26-27, 29, Page ID # 854-55; RE 33-3, Sneed Dep. Ex. 3 at 55, Page ID # 770).  During their employment, neither Plaintiff was formally disciplined. (RE 33-2, Sneed Dep. 131-32, 158, 160, Page ID # 641-42, 668, 670; RE 33-1, Smith Dep. 58, 80, Page ID # 458, 480; RE 33-4, Wright Dep. 32, 48, Page ID # 855, 859).

Smith "got fed up with the working conditions" as they "[g]ot to be unbearable" and ultimately left his employment due to the continuous race discrimination and harassment. (RE 33-1, Smith Dep. 59, Page ID # 459).  PAM testified that Smith left in good standing. (RE 33-4, Wright Dep. 43, Page ID # 858). While he found an "over-the-road" as opposed to a "local" driving job shortly before he left PAM, he did not like the nature of the job and did not remain in it for long. He left that job for another local driving job. (RE 33-1, Smith Dep. 80-81, Page ID # 480-81).

PAM asserted that it discharged Sneed on April 16, 2020, "for performance" and specifically for "refusing loads or – and leaving in the middle of a shift and basically just not doing his job the way he was supposed to." (RE 33-4, Wright Dep. 52, Page ID # 860).  Davis "made the recommendation" to discharge Sneed to Claytor.  Claytor supported the recommendation and "it was ultimately [former

16

Driver Liaison] Tyrone Luckett who let [Sneed] go." (*Id*. at 53-54, 58-59, Page ID # 861-62; RE 33-3, Sneed Dep. Ex. 3 at 106, 108, Page ID # 821, 823). Claytor and Luckett relied on what Davis said in discharging Sneed. HR was not involved. (RE 33-4, Wright Dep. 54, Page ID # 861).

In PAM's Driver Review Details for Sneed, supervisor Charles Dinkins documented that Sneed was a "Reliable driver, no issues to report" as of February 10, 2020. (RE 33-3, Sneed Dep. Ex. 3 at 104, Page ID # 819). On February 24, 2020, Dinkins documented that Sneed "continues to be a valuable asset to the TRR team." (*Id.*). On March 20, 2020, Dinkins again documented that Sneed was a "reliable driver, no issues to report." (*Id.*). Sneed "never had any complaints" about his work, "never had any write-ups," and "never had any accidents." (RE 33-2, Sneed Dep. 131-32, 158, 160-63, Page ID # 641-42, 668, 670-73). Nevertheless, PAM discharged Sneed shortly after his continued complaints of race discrimination and harassment. (*Id*. at 131-32, 157-58, 160-63, 172, RE 33-2, Page ID # 641-42, 667-68, 670-73, 682).

PAM has "no idea" and "d[oes] not know" who replaced either Smith or Sneed. (RE 33-4, Wright Dep. 45, 55, Page ID # 859, 86). Soon after it discharged Sneed on April 16, 2020, PAM discharged Davis in May 2020 because he "stopped coming to work." (*Id*. at 44-45, Page ID # 858-59).

## SUMMARY OF THE ARGUMENT

The district court incorrectly dismissed Smith's and Sneed's hostile work environment claims on the basis that the harassment they experienced (1) was not based on race and (2) was neither severe nor pervasive. (RE 43, Mem. Opin. at 81-88, Page ID # 1023-30). Plaintiffs presented evidence from which a reasonable jury could conclude that the harassment they suffered and reported to PAM management was based on their race and was severe and/or pervasive.

First, Plaintiffs presented evidence of continuous discriminatory conduct and treatment by their supervisors, Davis and Claytor, that a reasonable jury could find to have been motivated by their race. Plaintiffs' deposition testimony provides specific evidence of discriminatory treatment that they personally observed, reported to PAM management, and discussed among themselves and with other drivers. For example, PAM assigned Plaintiffs heavier workloads and required them to work longer days and more and longer driving routes than their non-African American counterparts. This resulted in Plaintiffs receiving less pay per hour for their work than non-African American drivers.

In addition to the continuous discriminatory conduct, Plaintiffs presented evidence of their supervisors' racial slurs and abusive behavior. Davis and Claytor repeatedly referred to Plaintiffs as "monkey" and "monkey ass" in a hostile and threatening manner. They also continuously cussed, screamed, criticized, belittled,

talked down to, and threatened Plaintiffs with discipline and discharge. Plaintiffs' testimony about what their supervisors stated and did to them, about how they heard and observed those supervisors speaking to and treating non-African American drivers, and about their complaints to PAM management about the discrimination is admissible evidence from which a reasonable jury could conclude that the harassment Plaintiffs experienced was based on their race.

Second, throughout Plaintiffs' employment, Davis and Claytor subjected them to continuous discriminatory and abusive treatment, comments, and behavior. Their racial slurs were severe as they were accompanied by threats to Plaintiffs' continued employment and Smith and Sneed were constructively and actually discharged, respectively. The district court improperly refused to consider Plaintiffs' evidence of discriminatory conduct as part of the "totality of the circumstances." In addition to the racial comments and abusive behavior, those circumstances included discriminatory work assignments, hours, benefits, trucks, and other treatment that contributed to the hostile work environment.

Viewing all of the evidence combined in the light most favorable to Plaintiffs, a reasonable jury could find that the discriminatory harassment to which their supervisors subjected them was based on their race and was severe or pervasive enough to create a hostile work environment.

# ARGUMENT

## I.    Standard of Review

The Court reviews a district court's grant of summary judgment *de novo*. Summary judgment is appropriate only when there is no genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "At the summary judgment stage, courts are required to 'view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.'" *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  "If the evidence would allow a reasonable jury to find in favor of a non-moving party, summary judgment may not be granted." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## II.    The District Court Incorrectly Dismissed Plaintiffs' Hostile Work Environment Claims

The district court incorrectly dismissed Plaintiffs' hostile work environment claims on the basis that the harassment they experienced (1) was not based on race and (2) was neither severe nor pervasive. (RE 43, Mem. Opin. at 81-88, Page ID # 1023-30).  Plaintiffs presented evidence from which a reasonable jury could conclude, however, that the harassment they suffered and repeatedly reported to

20

PAM management was based on their race and was severe or pervasive enough to create a hostile work environment.

## A.      The Harassment was Based on Race

Plaintiffs may establish their hostile work environment claims by showing that (1) they "belonged to a protected group," (2) they were "subject to unwelcome harassment," (3) "the harassment was based on race," (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," and (5) "the defendant knew or should have known about the harassment and failed to act." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 503 (6th Cir. 2021) (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).[4]

### 1.      Discriminatory conduct and treatment

"A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Williams*, 643 F.3d at 511.  "Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not

---

[4] The district court correctly recognized that the standards for evaluating Plaintiffs' claims under § 1981 and the THRA are the same as under Title VII. (RE 43, Mem. Opin. at 7-8, Page ID # 949-50); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, n. 5 (6th Cir. 2000); *Chattman v. Toho Tenax Amer., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012).

be overtly racist to qualify." *Id.* (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) ("Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, she would not have been the object of harassment)); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) ("Facially neutral incidents may be included in a hostile-work-environment analysis of the totality of the circumstances when there is some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory.") (citation omitted); *Bradley v. Arwood*, 705 Fed. Appx. 411, 420 (6th Cir. 2017) ("Because 'comparative evidence' that an alleged harasser treated peers of different races differently may be used to show that facially neutral treatment is actually race-based . . . [supervisor]'s more favorable treatment of [plaintiff]'s white peer may be considered evidence of race-based harassment.").

In *Clay v. UPS*, the plaintiff did "not allege that any racially derogatory comments were made in the workplace; her claim is based on the theory that the facially neutral conduct of her supervisor towards her was, in fact, based on her race." *Clay*, 501 F.3d at 706. She "claim[ed] that [supervisor] singled her out and castigated her for engaging in behaviors in which her white counterparts engaged with impunity. In support of her argument that she was harassed based on her race, [plaintiff] supplied her own affidavit as well as affidavits from two co-workers." *Id.*

The district court found that the "affidavits were 'speculat[ive]' and 'lack[ed] sufficient detail,' and failed to specify whether [supervisor] knew about the white employees' conduct." *Id.*

This Court disagreed, finding that the "affidavits set forth specific conduct for which [plaintiff] was berated and for which her white co-workers were not; thus, the district court erred in finding that these affidavits did not provide sufficient detail." *Id*. at 706-07. The court continued, "We also reject the district court's rejection of the affidavits as 'speculat[ive].'. . . A fair reading of at least one of the affidavits establishes that [supervisor] did witness white employees engaging in similar conduct for which he failed to discipline them." *Id*. at 707. The court concluded that since the plaintiff alleged that her supervisor "disciplined her for things for which he did not discipline her co-workers, [plaintiff] has created an inference, sufficient to survive summary judgment, that race was the motivating reason behind [supervisor]'s behavior. Accordingly, the district court erred in finding otherwise." *Id*.; *see also Bradley*, 705 Fed. Appx. at 418-20.

The same should be said here. As in *Clay*, Smith's and Sneed's deposition testimony provides specific evidence of discriminatory treatment that they personally observed and discussed with supervisors and among themselves. For example, PAM assigned Plaintiffs heavier workloads and required them to work longer days and more and longer driving routes than their non-African American

counterparts.  This resulted in Plaintiffs receiving less pay per hour for their work than non-African American drivers. (RE 33-1, Smith Dep. 33-35, 46, 52-53, 68-69, 71-73, 76, Page ID # 433-35, 452-53, 468-69, 471-73, 476; RE 33-2, Sneed Dep. 90, 95-97, 123-24, 133, 136-38, 146-47, 150, Page ID # 600, 605-07, 633-34, 643, 646-48, 656-57, 660).

The district court's repeated arguments—which PAM never raised—that "Smith's assertion that non-African American drivers received the same pay for driving shorter routes and working less hours is (like Sneed's) based entirely on unsubstantiated hearsay" are incorrect. (RE 43, Mem. Opin. at 53-54, Page ID # 995-96; *see also id*. at 42-44, 65-66, 85, Page ID # 984-86, 1007-08, 1027).  Like Plaintiffs, PAM testified that its drivers "always" received $180 per day, regardless of whether it "took seven hours" or "12 hours" to complete an assignment. (RE 33-4, Wright Dep. 20-21, Page ID # 852-53; RE 33-1, Smith Dep. 52-53, Page ID # 452-53).  Further, Plaintiffs' personal observations of, and discussions with, non-African American drivers and supervisors about the work assignments are not mere "speculation" and "hearsay."  The managers discussions are not hearsay under Fed. R. Evid. 801(d)(2).  They are also evidence of their discriminatory, "then-existing state of mind (such as motive, intent, or plan)" and admissible under Fed. R. Evid. 803(3) and/or the residual exception in Fed. R. Evid. 807(a). 2 McCormick on Evidence § 249 (7th ed. 2013).  Thus, the Court may consider some or all of the

statements, or the fact that *Plaintiffs reported* the discriminatory conduct to management and confronted Davis and Claytor about it, as additional evidence of discriminatory motive.

Even if Plaintiffs' observations were hearsay, they may be considered at summary judgment. "Unfortunately, the district court [once again] misapprehended the requirements of Federal Rule of Civil Procedure 56, which requires a plaintiff's evidence to be admissible only as to its contents and not as to its form, as long as the plaintiff can proffer that it will be produced in an admissible form." *Wyatt v. Nissan N. Am., Inc*., 999 F.3d 400, 423 (6th Cir. 2021). "Thus, 'deposition testimony will assist a plaintiff in surviving a motion for summary judgment, even if the deposition itself is not admissible at trial, provided substituted oral testimony would be admissible and create a genuine issue of material fact.'" *Id.* (quoting *Bailey v. Floyd Cnty. Bd. of Educ*., 106 F.3d 135, 145 (6th Cir. 1997)). In *Bard v. Brown County*, 970 F.3d 738 (6th Cir. 2020), the court stated that "out-of-court statements may constitute inadmissible hearsay, but it is well-established that the party opposing summary judgment need not 'produce evidence in a form that would be admissible at trial in order to avoid summary judgment.'" *Id.* at n. 12 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

The same may be said here. "[I]n determining whether to consider hearsay evidence, [the court] may inquire as to whether the party opposing summary

judgment is capable of producing an otherwise inadmissible hearsay statement in a form that will be admissible at trial, *i.e.*, via substituted oral testimony by the third-party declarant." *Wyatt*, 999 F.3d. at n. 8 (collecting cases).  PAM's current and former employees, including the several named managers, and drivers such as Melvin and Chris, can testify at trial about the work assignments, and Plaintiffs can testify about their assignments and observations. *Id.*

With respect to the "white" and "non-African American" drivers Plaintiffs referenced throughout their deposition testimony, including Melvin and Chris, Plaintiffs respectfully request that the Court correct the district court's belabored musings that Plaintiffs' own observations and perceptions of, and testimony about, "the races" of those drivers is inadmissible or insufficient at the summary judgment stage. (*See* RE 43, Mem. Opin. at 39-43, 63-64, 66, 85 and footnotes 55-57, 69, 71, 77, 80, Page ID # 981-85, 996, 999, 1003, 1005-06, 1008, 1027).  Notably, the district court cited no case law or binding authority suggesting that Plaintiffs' perceptions of their fellow drivers' races as "white" or "non-African American" is inadmissible or insufficient. (*Id.*).  Further, the district court took this exercise upon itself—PAM never argued or contested the races of the drivers such as Melvin or Chris whom Plaintiffs identified as "white."  "The EEOC Compliance Manual also expressly states that 'discrimination based on . . . a person's color' amounts to race discrimination.  The manual also references the racial categories provided by the

Office of Management and Budget—which include 'Black or African American'—and it expressly uses these two terms 'interchangeably.'" *El-Scari v. Comprehensive Mental Health Servs*., 2019 U.S. Dist. LEXIS 181882, at *14, 2019 WL 5386489 (W.D. Mo. Oct. 21, 2019) (quoting *EEOC Compliance Manual* at 15-4, 15-1 n. 2, 15-3). Thus, Plaintiffs' identification of "white" and "non-African American" drivers based on their own observations and perceptions constitutes admissible evidence, particularly for purposes of summary judgment.

Continuing with the discriminatory treatment, Smith worked close to 70 hours per week. (RE 33-1, Smith Dep. 38, 49, Page ID # 438, 449). Three to four times per week, PAM required him to run more than one load per day. (*Id*. at 52, Page ID # 452). The routes PAM assigned Smith were "way longer" than those it assigned to "the white drivers." (*Id.* at 68-69, Page ID # 468-69). Smith observed and discussed with managers "the actual work load nobody else was getting outside of the African Americans. The longer day we was receiving" and the fact that non-African American drivers were working four hours per day for $180 while he was working 10 hours per day for the same rate. (RE 33-1, Smith Dep. 46, Page ID # 446). When Smith complained "more than ten times" about "having to work more hours" than non-African American drivers, Davis told him, "You get what you get," "That's part of it," and "Maybe you need . . . to find another job." (RE 33-1, Smith Dep. 70, 74-75, Page ID # 470, 474-75). This non-explanation and threat to

27

continued employment contributed to the hostile work environment. *Bradley*, 705 Fed. Appx. at 419 ("[supervisor] has not offered any alternative explanation, based on the evidence or common sense, for [the] propos[ed action].").

Sneed likewise observed that fellow driver Melvin, who is white, "only had to do one load" per day to Horse Cave, Kentucky. Meanwhile Sneed often had to drive two loads per day to Horse Cave. (RE 33-2, Sneed Dep. 90-91, Page ID # 600-01). Davis was "running the clock out" on Sneed and having him "illegally driving" more hours per day than the law allowed while not doing this to non-African American drivers. (*Id*. at 95-98, 108-10, 115-178 Page ID # 605-08, 618-20, 625-28). Sneed observed and discussed with managers and co-workers the fact that non-African American drivers at the Whites Creek location "would go home and I would have another trip to Horse Cave where they would get in their trucks or their cars and go home." (*Id*. at 136, Page ID # 646). He observed and discussed non-African American drivers' receiving shorter, more desirable routes than African American drivers, such as to nearby Clarksville, Tennessee, and Mt. Juliet, Tennessee. (*Id*. at 146-47, Page ID # 656-57). Sneed testified, "If I'm having to work full days and they're only working half a day getting paid the same, their hourly rate is higher than mine. So they're only working 4 or 5 hours where I'm working 12" and "[t]hey got paid for a whole day." (*Id*. at 136-37, Page ID # 646-47). The extra loads, disparate work assignments and excessive hours further support Plaintiffs' hostile work

environment claims. *McNeal v. City of Blue Ash*, ___ F.4th ___, 2024 U.S. App. LEXIS 24123, at *33 (6th Cir. Sept. 23, 2024) (plaintiff "further alleges that the Department intended to humiliate him by assigning him to a traffic study that it knew he would not be able to successfully complete.").

Sneed also discussed with white drivers Melvin and Chris, and supervisors Davis and Claytor, how white drivers received holiday pay and paid time off while he did not. (RE 33-2, Sneed Dep. 128-30, 143-44, Page ID #638-40, 653-54). PAM further assigned Plaintiffs and other African American drivers older, damaged, and less desirable trucks with more miles on them than it assigned non-African American drivers. (RE 33-1, Smith Dep. 37, 63-65, 72, 76, Page ID # 437, 463-65, 472, 476; RE 33-2, Sneed Dep. 78-82, 138, 141, Page ID # 588-92, 648, 651). Sneed's truck "was the oldest truck" while non-African American drivers he observed "had brand new trucks." (RE 33-2, Sneed Dep. 78-80, Page ID # 588-90). PAM did not know how trucks were assigned. (RE 33-4, Wright Dep. 36, Page ID # 856).[5] Accordingly,

---

[5] This was one of several topics in Plaintiff's Fed. R. Civ. P. 30(b)(6) Notice of Deposition to PAM about which PAM testified it "did not know" the answers. (RE 33-5, Notice of Deposition at 3, ¶¶ 18- 20, Page ID # 875). The district court excused this and viewed the facts and drew inferences in favor of PAM, stating, "Wright's lack of knowledge . . . even if she was Defendant's designated 30(b)(6) witness, and even if the specific issue was included as a topic in the notice of deposition—is [not] evidence sufficient to raise a genuine issue" on the topic. (RE 43, Mem. Opin. at 36, Page ID # 978). It overlooked that "[t]he law is well-settled that corporations have an 'affirmative duty' to make available as many persons as necessary to give 'complete, knowledgeable, and binding answers' on the corporation's behalf. *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d

Plaintiffs presented evidence of discriminatory conduct and treatment that substantially contributed to the hostile work environment.

### 2.    Discriminatory and abusive comments and behavior

As shown above, Plaintiffs' presented as much or more evidence of discriminatory treatment in support of their hostile work environment claims than the plaintiff in *Clay*. *Clay*, 501 F.3d 706-07.  But that is not all.  Unlike that plaintiff, who did "not allege that any racially derogatory comments were made in the workplace," *id*. at 706, Smith and Sneed testified that supervisors Davis and Claytor repeatedly referred to them as "monkey" and "monkey ass" in a hostile and threatening tone and subjected them to other verbally abusive behavior—*e.g.*, cussing, screaming, criticizing, belittling, talking down to, and threatening with discipline and discharge—to which they did not subject non-African American drivers. (RE 33-1, Smith Dep. 46-48, 53-58, 76, 78, 95, Page ID # 446-48, 453-58,

---

1135, 1147 (10th Cir. 2007) (quoting *Reilly v. Natwest Mkts. Group Inc*., 181 F.3d 253, 268 (2d Cir. 1999)).  Further, "Because Rule 30(b)(6) witnesses testify to corporate knowledge as opposed to personal knowledge, their testimony 'bind[s] the entity that they are representing.'" *Schnatter v. 247 Grp., LLC*, 343 F.R.D. 325, 331 (W.D. Ky. 2022) (citation omitted); *see also QBE Ins. Corp. v. Jorda Enters*., 277 F.R.D. 676, 290 (S.D. Fla. 2012) (observing that "the we – don't – know" response can be binding on the corporation and prohibit it from offering evidence at trial on those points.  Phrased differently, the lack of knowledge answer is itself an answer which will bind the corporation at trial."); *Ierardi v. Lorillard, Inc*., 1991 WL 66799, at *3 (E.D. Pa. Apr. 15, 1991) ("if a party's 30(b)(6) witness, because of lack of knowledge or failing memory, provides a 'don't know' answer, then 'that is itself an answer' and the corporation 'will be bound by that answer'")).

476, 478, 495; RE 33-2, Sneed Dep. 125-26, 131-32, 152-55, Page ID # 635-36, 641-42, 662-65).

Sneed testified that Claytor "used *monkey*, like [Davis].  *Monkey ass*, they used that." (RE 33-2, Sneed Dep. 155, Page ID # 665).  Davis told Sneed, "[Y]ou're going to get your monkey A-S-S out there and do the job or . . . I'm going to write you up," among other "threats" toward him. (*Id*. at 153, Page ID # 663).  Claytor's cussing and screaming at Sneed and calling him "monkey" and "monkey ass" was also "very disturbing." (*Id*. at 154-55, Page ID # 664-65).

Smith testified that Davis engaged in "'name calling.'  Like the—he used the *monkey—monkey A*" and "call[ed] him outside of [his] name . . . like the *monkey— the monkey ass*." (RE 33-1, Smith Dep. 47, 54, Page ID # 447, 454).  Davis threatened Smith, "[I]f you don't do this, you're going to get . . . terminated or not get paid.  Or [if] you can't do the job, you don't need to be here" and "find another job." (*Id*. at 58, 74-75, Page ID # 458, 474-75).  As demonstrated below, these racial slurs and threats were part of a broader pattern of Davis and Claytor continuously verbally abusing Plaintiffs.

In finding that "Plaintiffs have not raised a genuine issue of fact as to whether Davis' and Claytor's use of 'monkey ass' was based on Plaintiffs' race," the district improperly viewed the facts and drew inferences in favor of PAM. (RE 43, Mem. Opin. at 86, Page ID # 1028).  It was "required to view the facts and draw reasonable

31

inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).

A reasonable jury could conclude that Plaintiffs' supervisors' repeatedly calling them "monkey" and "monkey ass"—coupled with their hostile and threatening tone, continuous verbally abusive behavior, and ongoing discriminatory treatment—was racially motivated.  Plaintiffs testified that they did not treat non-African American drivers the way they treated them.  Moreover, courts have recognized that a supervisor's—and even a co-worker's—calling an African American employee a "monkey," or other derivates of that word, is highly offensive to African Americans and supports a racially hostile work environment claim. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2014) (en banc) ("a reasonable jury could find that [supervisor]'s two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment."); *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (stating in case where African American bank teller was called "monkey" by a co-worker, "The use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country" and "[p]rimate rhetoric has been used to intimidate African-Americans and monkey imagery has been significant in racial harassment in other contexts as well."); *Jones v. UPS Ground Freight*, 683 F.3d

1283, 1297 (11th Cir. 2012) ("'Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that' the use of monkey imagery is intended as a 'racial insult' where no benign explanation for the imagery appears.") (quoting *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998)); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("[supervisor]'s constant use of the word 'monkey' to describe African-Americans was similarly odious. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.") (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000)).

The unreported decision in *Ejikeme v. Violet*, 307 Fed. Appx. 944 (6th Cir. 2009), upon which the district court relied is distinguishable from this case. (RE 43, Mem. Opin. at 86-88, Page ID # 1028-30).  There, the plaintiff "was subjected only to a few scattered comments over several years, almost all of which had no apparent connection to his race, religion, or national origin." *Id*. at 949.  Unlike in this case, there was no evidence of an ongoing pattern of discriminatory treatment and verbally abusive behavior.  And, unlike in this case, the plaintiff never complained of discrimination before filing his lawsuit and the employer "responded promptly" to complaints he did make, establishing its affirmative defense. *Id*. at 949-50.

Similarly, in *Williams v. CSX*, also cited by the district court, the racist comments—"calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where [they] came from'"—were not about the plaintiff, were never repeated, and were not coupled with continuous verbally abusive behavior and other discriminatory conduct by the employees who uttered them. *Williams*, 643 F.3d at 513.

Furthermore, in considering Davis' and Claytor's discriminatory and abusive comments and behavior, the district court improperly parsed out, expressly "[p]ut aside," and completely isolated "Defendant's alleged use of 'monkey ass'" from the remainder of the discriminatory conduct and behavior. (RE 43, Mem. Opin. at 84, 86-88, Page ID # 1026, 1028-30). This was error. Defendant's "monkey" and "monkey ass" comments must be viewed in combination and together with—not separate and apart from—Plaintiffs' above evidence of discriminatory treatment and their observations, complaints to management, and testimony about how Davis and Claytor treated them as compared to non-African American employees. *McNeal*, ___ F.4th ___, 2024 U.S. App. LEXIS 24123, at *34 ("In a hostile-work-environment claim, it is improper to 'carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode.'") (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir. 1999)). Indeed, "the 'totality of the circumstances' approach requires" courts "to examine [plaintiff]'s treatment

cumulatively to see whether it created an atmosphere of hostility that was more than the sum of its parts." *Id*. at *34.

The district court plainly did not do this. Instead, it "carved the work environment" into discrete parts: (1) "[Plaintiffs] received less pay" and (2) "Davis and Claytor spoke to them in an abusive manner" and "refer[ed] to them as 'monkey ass.'" (*Id*. at 81-83, Page ID # 1023-25). It then analyzed each independently from the other, and separate and apart from the totality of the discriminatory treatment Plaintiffs complained to management about. (RE 43, Mem. Opin. at 81-88, Page ID # 1023-30). It did not even consider the discriminatory *conduct* detailed above. (*Id*.).

Contrary to the district court's finding, Plaintiffs had "personal knowledge to support their testimony that Davis and Claytor did not speak to members of other races in the abusive manner in which they spoke to Plaintiffs." (*Id*. at 85, Page ID # 1027). Davis and Claytor spoke to Plaintiffs in an extremely hostile and abusive manner. They cussed, screamed, criticized, belittled, talked down to, and threatened Plaintiffs with discipline and discharge. Plaintiffs heard, observed, discussed with managers, and testified about the manner in which Davis and Claytor spoke to and interacted with non-African American drivers. Plaintiffs noticed that they did not treat those drivers with hostility or discriminate against them. (RE 33-1, Smith Dep. 43, 46-48, 53-58, 65, 76, 78, 86, Page ID # 443, 446-48, 453-58, 465, 476, 478, 486;

RE 33-2, Sneed Dep. 125-26, 131-32, 152-55, 165, Page ID # 635-36, 641-42, 662-65, 675).

Plaintiffs further communicated with each other during their employment about how they were being discriminated against and harassed because of their race. (RE 33-1, Smith Dep. 43, 55-56, 65, 86, Page ID # 443, 455-56, 465, 486; RE 33-2, Sneed Dep. 165, Page ID # 675). This further supports their hostile work environment claims. The Court "has made clear that a comment need not be 'directed at' a plaintiff, in order to constitute harassment." *Johnson v. UPS*, 117 Fed. Appx. 444, 456 (6th Cir. 2004) (quoting *Jackson*, 191 F.3d at 661). "In fact, [*Jackson v.*] *Quanex* also clarified that a plaintiff need not even witness remarks or behavior first-hand in order to allege that the remarks or behavior contributed to a hostile work environment." *Id.*; *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (court must "consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence.").

PAM presented no evidence that Davis and Claytor spoke to and treated non-African American drivers in the hostile and abusive manner in which they did Plaintiffs or that they called any other driver "monkey" and "monkey ass." The district court drew the wrong inferences. Plaintiffs' testimony about what their supervisors stated and did to them, about how they heard and observed their

supervisors speaking to and treating non-African American drivers, and about their complaints to PAM management about the discrimination is admissible evidence from which a reasonable jury could conclude that the harassment Plaintiffs experienced was based on their race.

### B.    The Harassment was Severe and/or Pervasive

In determining whether harassment is sufficiently severe or pervasive to create a hostile work environment, the Court must consider "the totality of the circumstances" rather than each event complained of in isolation. *Johnson v. Ford*, 13 F.4th at 505 (quoting *Jackson*, 191 F.3d at 658). "[T]his inquiry is not 'a mathematically precise test'" and relevant considerations "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*.; *Harris v. Forklift Sys*., 510 U.S. 17, 22-23 (1993). However, "no single factor is required." *Harris*, 510 U.S. at 23. The work environment need not be "psychologically injurious." Nor must it affect the plaintiff's job performance or opportunities. *Id*. at 21-22. The Court "consider[s] the 'work environment as a whole,' rather than individual instances of harassment." *Smith v. Rock-Tenn Servs., Inc*., 813 F.3d 298, 310 (6th Cir. 2016) (citation omitted).

The Court has "clarified that '[t]he totality of the circumstances, of necessity, includes all incidents of alleged harassment;' therefore, 'the issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case.'" *Johnson*, 13 F.4th at 505 (emphasis in original) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999)). "[T]he totality-of-the-circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment . . . [and] includes all incidents of alleged harassment." *Williams*, 187 F.3d at 562-63.

"[E]ven where individual instances of … harassment do not on their own create a hostile work environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* at 563. In other words, a "work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode crosses the Title VII threshold." *Id.* at 564; *see also Green v. Brennan*, 578 U.S. 547, 557, 562, and n.7 (2016) (a hostile-work-environment claim "includes every act composing that claim, whether those acts are independently actionable or not.") (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21 (2002)); *Schlosser v. VRHabilis, LLC*, ___ F.4th ___, 2024 U.S. App. LEXIS 21523, *17 and n.1 (6th Cir. Aug. 26, 2024) ("Although discrete

acts of discrimination are not independently actionable as a hostile work environment claim, the jury may certainly consider such acts in its evaluation of the overall working environment."); *McNeal*, ___ F.4th ___, 2024 U.S. App. LEXIS 24123, at *27-30 and n. 14 ("In sum, except for the unpaid suspensions and termination that [plaintiff] conceded do not apply, [plaintiff]'s other evidence may be used to support his hostile-work-environment claim.").

The conduct complained of must be objectively and subjectively offensive and "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Johnson*, 13 F.4th at 505. Objective severity "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 81 (1998) (citation omitted). "'[C]omments and harassing acts of a 'continual' nature are more likely to be deemed pervasive' and evidence of an objectively hostile work environment." *Johnson*, 13 F.4th at 505 (quoting *Hawkins*, 517 F.3d at 333).

The plaintiff "'need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job.'" *Williams v. GMC*, 187 F.3d at 567 (quoting *Davis v. Monsanto Chem. Co*., 858 F.2d 345, 349 (6th Cir. 1988)); *Gallagher v. C.H. Robinson Worldwide, Inc*., 567 F.3d 263, 274 (6th Cir. 2009) ("the district court also

erred in requiring evidence that [plaintiff]'s work performance suffered measurably as a result of the harassment."). Further, the "harm does not have to be 'significant' or 'serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'" *McNeal*, ___ F.4th ___, 2024 U.S. App. LEXIS 24123, at \*24 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)).

"A plaintiff can succeed by showing that the harassment was either severe, pervasive, or both." *Rembert v. Swagelok Co*., 2023 U.S. App. LEXIS 10333, at \*7 (6th Cir. Apr. 26, 2023) (citing *Barrett v. Whirlpool Corp*., 556 F.3d 502, 514 (6th Cir. 2009) (explaining that these terms are "properly considered in the disjunctive"). Harassment is pervasive if it is "'ongoing,' 'commonplace,' [or] continuing.'" *Johnson*, 13 F.4th at 506. A hostile work environment may be established by a single event or comment if it is "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). For example, courts have held that even one use of a racial slur can be sufficient. *See Woods v. Cantrell*, 29 F.4th 284, 287 (5th Cir. 2022) ("The incident Woods has pleaded—that his supervisor directly called him a 'Lazy Monkey A__ N__' in front of his fellow employees—states an actionable claim of hostile work environment.") (citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("[I]n my view, being called the n-word by a supervisor—as [plaintiff] alleges happened to him—suffices by itself to

establish a racially hostile work environment.")); *Scaife v. U.S. Dep't of Veterans Affairs*, 49 F.4th 1109, 1116 (7th Cir. 2022) ("Because the N-word is egregious, we are not concerned with the number of times the epithet is used.  A one-time use of the epithet can in some circumstances warrant Title VII liability.") (citations omitted); *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017) ("it is clear that one such instance ["of use of the 'n-word'"] can suffice to state a claim."); *Johnson v. UPS*, 117 Fed. Appx. at 454 ("Case law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'") (citations omitted).

Further, comments and conduct by a supervisor are more serious than those of a co-worker because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).  In the end, "[W]hether harassment is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.'" *Hawkins*, 517 F.3d at 333 (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

As detailed above, throughout Plaintiffs' employment, supervisors Davis and Claytor subjected them to continuous discriminatory conduct, treatment, comments, and behavior.  Their racial slurs were severe as they were accompanied by threats to Plaintiffs' continued employment and Smith and Sneed were constructively and

actually discharged, respectively. (RE 33-2, Sneed Dep. 153-55, Page ID # 663-65; RE 33-1, Smith Dep. 47, 54, 58, 74-75, Page ID # 447, 454, 458, 474-75).

The district court improperly refused to consider Plaintiffs' evidence of discriminatory conduct or treatment as part of the "totality of the circumstances" in assessing their hostile work environment claims. (RE 43, Mem. Opin. at 82-83, Page ID # 1024-25). It incorrectly truncated and limited those circumstances to Plaintiffs' receiving "less pay" and Davis and Claytor speaking to them "in an abusive manner" and "referring to them as 'monkey ass.'" (*Id*. at 81-83, Page ID # 1023-25). As detailed above, the totality of the circumstances also included discriminatory work assignments, hours, benefits, trucks, and other treatment. This additional discriminatory conduct contributed to the hostile work environment. The district court erred in excluding it.

To be sure, in assessing Plaintiffs' work environment, "The court must review the 'constellation of surrounding circumstances' and the totality of the environment that contributed to the alleged hostile working environment." *Schlosser*, ___ F.4th ___, 2024 U.S. App. LEXIS 21523, at *17 (quoting *Oncale*, 523 U.S. at 81-82). In *Schlosser* the court observed that "the supervisors' decisions about which diving role [plaintiff] should fulfill on the team occurred daily" and "[t]hese everyday choices and occurrences are fairly characterized as 'repeated conduct' that contributed

towards the hostile work environment." *Id.* and n. 1; *see also Bradley*, 705 Fed. Appx. at 422; *Williams*, 187 F.3d at 563.

PAM's discriminatory and abusive treatment of Plaintiffs was ongoing and continuous throughout their employment. Indeed, despite their repeated complaints about it, "[N]othing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 78-79, Page ID # 478-79; RE 33-2, Sneed Dep. 109-11, 119, Page ID # 619-21, 629). In light of this fact, the district court's criticism of Plaintiffs' inability to recall some events in granular detail is inapposite. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (when plaintiff alleges ongoing harassment, the "inability to recount any more specific instances goes to the weight of [plaintiff's] testimony, a matter for the finder of facts.").

Further, Davis' and Claytor's discriminatory conduct, comments, and behavior interfered with Plaintiffs' job performance and made it more difficult for them to perform their jobs. (RE 33-1, Smith Dep. 56-59, Page ID # 456-59; RE 33-2, Sneed Dep. 132-35, Page ID # 642-45). Smith testified, "[I]t slowed me down, because . . . when you're getting treated like that, you pretty much don't want to be at work. . . . My morale was down," which affected his ability to perform his job. (RE 33-1, Smith Dep. 56-57, Page ID # 456-57). It was embarrassing, humiliating, and caused anxiety. (*Id.* at 95-97, Page ID # 495-97). Sneed testified, "[I]t kills your morale. And it hurts your enthusiasm and it makes [it] where it's harder to do the

job because . . . it puts you in a negative mind state . . . and brings on anxiety" and "has a direct effect on the way I feel, the way my body feel[s], and how I perform on the road." (RE 33-2, Sneed Dep. 132-34, Page ID # 642-44). "This evidence lends further credence to [plaintiff]'s argument that the alleged harassment was severe or pervasive enough to alter the conditions of his employment." *McNeal*, ___F.4th ___, 2024 U.S. App. LEXIS 24123, at *34 (citing *Harris*, 510 U.S. at 22).

Finally, as discussed below, another aspect of the totality of the circumstances that the district court refused to consider is the fact that both Plaintiffs repeatedly opposed and reported Davis' and Claytor's discriminatory conduct, comments, and behavior to members of PAM management, to no avail. Despite these managers' duties to take corrective action, none of them ever did. (RE 33-1, Smith Dep. 64-65, 77-79, Page ID # 464-65, 477-79; RE 33-2, Sneed Dep. 109-11, 119, Page ID # 619-21, 629). As a result, the harassment continued unabated until Plaintiffs' discharges, which further evidences "the severity of th[e] harassment and that it unreasonably interfered with [their] work performance." *Bradley*, 705 Fed. Appx. at 422.

Viewing all of Plaintiffs' evidence combined in the light most favorable to them, rather than PAM, a reasonable jury could find that the discriminatory harassment to which their supervisors subjected them was severe or pervasive enough to create a hostile work environment. The district court erred in holding otherwise. *Johnson*, 13 F.4th at 506 ("the district court erred in granting summary

44

judgment to [defendant] on the severe or pervasive prong of [plaintiff]'s claim because there is sufficient evidence in the record that [supervisor]'s racial harassment was severe or pervasive enough for a reasonable person to find the work environment hostile.").

### C.    PAM is Liable

The district court stated that "Defendant also argues that Plaintiffs cannot establish the fifth element (Defendant's liability) for any hostile work environment" but that "because Plaintiffs are unable to raise a genuine issue of fact as to the third and fourth elements, the Court need not (and does not) assess the fifth element." (RE 43, Mem. Opin. at 84, n. 95, Page ID # 1026).  Even though the court refused to consider the issue, Plaintiffs address it to avoid waiver and because PAM's failure to take corrective action in response to their repeated complaints of race discrimination and harassment factored into the totality of the circumstances of the hostile work environment in which they were immersed.

"'[A]n employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Clark v. UPS*, 400 F.3d 341, 348 (6th Cir. 2005) (emphasis in original) (quoting *Jackson*, 191 F.3d at 663).  Where "the victim did suffer some tangible employment action, such as a demotion, discharge, or

undesirable transfer, then liability is automatic and the employer does not have the benefit of the affirmative defense." *Id.* at n. 1 (citing *Williams*, 187 F.3d at 561).

Contrary to PAM's argument in the district court, it cannot avail itself of the *Faragher/Ellerth* affirmative defense. (RE 25, Mem. at 19, Page ID # 178). Smith and Sneed suffered tangible employment actions when they were constructively and actually discharged, respectively, following the discrimination and harassment to which they were subjected and about which they complained to management. Thus, no affirmative defense is available to PAM. *Clark*, 400 F.3d at 348, n. 1.

Even if Plaintiffs had not suffered tangible employment actions, PAM would only be entitled to assert the affirmative defense it if it could establish both: (1) that it exercised reasonable care to prevent and correct promptly Plaintiffs' supervisors' racial harassment and (2) that Plaintiffs unreasonably failed to take advantage of any preventative or corrective opportunities it provided. *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. PAM cannot prove either, let alone both, elements.

First, PAM did not exercise reasonable care to prevent and promptly correct the harassment Plaintiffs reported to it. While it had an anti-harassment policy, it did not "effectively implement" it. *Clark*, 400 F.3d at 349-50. It did nothing to "prevent or correct promptly" the discrimination and harassment Plaintiffs reported. (RE 33-1, Smith Dep. 77-78, Page ID # 477-78; RE 33-2, Sneed Dep. 108-09, 119,

142, 176-77, Page ID # 618-19, 629, 652, 686-87). It did not conduct any investigation at any time. (RE 33-4, Wright Dep. 36, 50, Page ID # 856, 860).

In response to Smith's complaints, Davis told him, "You get what you get," "That's part of it," and "Maybe you need . . . to find another job." (RE 33-1, Smith Dep. 70, 74-75, Page ID # 470, 474-75). Brown responded to Smith that the discrimination "shouldn't be going on," that "[e]verybody should get the same treatment." Brown advised Smith that he "would check into it," and "said he did," but "nothing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 64-65, 77-78, Page ID # 464-65, 477-78).

In response to Sneed's complaints, PAM's managers stated they "would look into" them but never followed up with him and "didn't do anything." (RE 33-2, Sneed Dep. 108-11, Page ID # 618-21). As a result, the race discrimination and harassment continued and "kept going on" after Plaintiffs complained about it. "Nothing was ever done," "It didn't get any better," and PAM "retaliated" against Plaintiffs for complaining about it. (RE 33-1, Smith Dep. 78-79, Page ID # 478-79; RE 33-2, Sneed Dep. 116, 119, 142, 156-57, 171-72, Page ID # 626, 629, 652, 666-67, 681-82). Thus, at the very least, "whether [PAM] . . . exercised reasonable care is a question for a factfinder." *Clark*, 400 F.3d at 350.

Second, PAM's Driver Manual and Anti-Harassment Policy permitted Plaintiffs to report discrimination and harassment to "any manager," including but

not limited to "the Driver Liaison, your Driver Manager, Operations Manager, or the Driver Resources Department" as well as "a Supervisor, Driver/Fleet Manager, or HR." (RE 33-4, Wright Dep. 25, 35, Page ID # 854, 856; RE 33-2, Sneed Dep. Ex. 3 at 49, 53, Page ID # 764, 768).  PAM expected its managers to report any complaints of discrimination or harassment to its Human Resources Department and "instructed [them] that they are supposed to do that." (RE 33-4, Wright Dep. 35, Page ID # 856).

Plaintiffs continuously opposed Davis' and Claytor's discriminatory conduct, comments, and behavior throughout their employment.  As detailed in Section IV of the Statement of the Case, they repeatedly reported and complained about specific conduct and "the intolerable work conditions and the race discrimination" to Davis and Claytor and other managers, including former Driver Liaisons James Brown (Smith and Sneed), Tyrone Luckett and Keith Coatney, and the Driver Liaisons' supervisor, former employee Fred Meek (Sneed). (RE 33-1, Smith Dep. 45-49, 54-56, 58-62, 64-65, 69-70, 72-75, 76-77, Page ID # 445-49, 454-56, 458-62, 464-65, 469-70, 472-75, 476-77; RE 33-2, Sneed Dep. 95-98, 104-113, 116-19, 137-42, 148-51, 172, 174-77, Page ID # 605-08, 614-23, 626-29, 647, 647-52, 658-61, 682, 684-87; RE 33-4, Wright Dep. 14-15, 59-63, Page ID # 851, 862-63).

Smith complained to Brown about the race discrimination and harassment multiple times by phone. (RE 33-1, Smith Dep. 45-49, 64-65, 76-77, Page ID # 445-

49, 464-65, 476-77).  Sneed complained to several managers in person, by phone, and through the Qualcomm system in the trucks. (RE 33-2, Sneed Dep. 107-13, 116-17, 119, 141-42, 174, 177, Page ID # 617-23, 626-27, 629, 651-52, 684, 687).

The district court's indication that Sneed complained to Davis "only through Qualcomm" is incorrect. (RE 43, Mem. Opin. at 75, Page ID # 1017).  Sneed repeatedly complained to several managers, including but not limited to Davis, orally by phone and in person. (RE 33-2, Sneed Dep. 107-13, 116-17, 119, 141-42, 174, 177, Page ID # 617-23, 626-27, 629, 651-52, 684, 687).  The district court used its false implication to expressly make "credibility" determinations about Sneed and to weigh the evidence, which is improper at summary judgment. (RE 43, Mem. Opin. at 75, Page ID # 1017).

Regarding Sneed's missing Qualcomm complaints, which PAM did not retain, the district court acknowledged that Plaintiffs issued subpoenas to the custodian to whom PAM directed them, Omnitracs and its registered agent, on May 18, 2022. (*Id*. at n. 89, Page ID # 1019; RE 34-35, Subpoenas, Page ID # 881-88). It neglected to mention that, on May 27, 2022, Omnitracs' in-house counsel responded to Plaintiffs' and PAM's counsel that Plaintiffs' "Subpoena is largely moot as no responsive data or records relevant to the Subpoena for the date range would be retained.  *Accordingly, Omnitracs is unable to produce any data or records pursuant to the Subpoena*." (RE 36-6, Emails at 2, Page ID # 879) (emphasis added).

49

On May 31, 2022, Plaintiffs' counsel responded, "[I]f the proper custodian of records for Omnitracs will execute a sworn declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 that no data or records responsive to the subpoena are in Omnitracs' possession, custody, or control, and that Omnitracs has taken all appropriate steps to verify that fact, then we will release it from the subpoena." (*Id.* at 1, Page ID # 878). On June 22, 2022, Omnitracs' Senior Vice President Customer Experience/Head of Operations, Joseph Ohr, provided a sworn declaration to Plaintiffs' and PAM's counsel "certify[ing] under oath that *Omnitracs has no data or records responsive to Plaintiffs' Subpoena* in its possession, custody, or control, and that I have taken the appropriate steps to determine and verify that fact." (emphasis added). PAM cannot dispute this fact and Plaintiffs will file the declaration with the Court upon its request.

Accordingly, based on Sneed's testimony, PAM's testimony that Qualcomm messages only remained readily accessible for "about six months" (RE 33-4, Wright Dep. 34, Page ID # 856), PAM directing Plaintiffs to Omnitracs to obtain Qualcomm messages, and Omnitracs' inability to produce anything, a reasonable inference may be drawn that Sneed complained of discrimination through Qualcomm, in addition to orally.

PAM disingenuously argued that former Driver Liaison Brown, to whom Plaintiffs complained of discrimination, "did not have any supervisory or

management authority." (RE 25, Memorandum at 9, Page ID # 168). The record contradicts its assertion. Like Luckett, Brown was a Driver Liaison. (RE 33-4, Wright Dep. 59-60, 62, Page ID # 862-63). Driver Liaisons had the authority to terminate drivers' employment. (RE 33-4, Wright Dep. 14, Page ID # 851). Indeed, according to PAM, Luckett made the decision to terminate Sneed's employment. (RE 33-4, Wright Dep. 53-54, Page ID # 861; RE 33-3, Sneed Dep. Ex. 3 at 106, 108, Page ID # 821, 823). Therefore, Brown did have management authority.

Furthermore, "An employer is deemed to have notice of harassment reported to any supervisor or department head who has been authorized—or is reasonably believed by a complaining employee to have been authorized—to receive and respond to or forward such complaints to management." *Gallagher*, 567 F.3d at 277; *Clark*, 400 F.3d at 350 (same); *West v. Tyson Foods, Inc*., 374 Fed. Appx. 624, 634 (6th Cir. 2010) ("'actual notice is established by proof that management knew of the harassment'") (citation omitted). Plaintiffs believed Brown and the other managers to whom they complained were so authorized, as stated in PAM's policies. Thus, they did not unreasonably fail to follow such policies and PAM is not shielded from liability. The district court erred in granting summary judgment as to Plaintiffs' hostile work environment claims.

## CONCLUSION

For the reasons discussed above, Smith and Sneed respectfully request that the Court reverse the judgment of the district court granting PAM's motion for summary judgment as to their hostile work environment claims and remand this case for further proceedings.

Respectfully submitted,


s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

s/Stephen W. Grace
Stephen W. Grace, (TN BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee 37212
(615) 255-5225
sgrace@sgracelaw.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,443 words according to Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

s/Douglas B. Janney III
Douglas B. Janney III

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this Brief of Appellants Smith and Sneed using the Court's CM/ECF system upon M. Reid Estes, Jr., and Autumn L. Gentry, Dickinson Wright PLLC, 424 Church Street, Suite 800, Nashville, Tennessee 37219 on October 4, 2024.

s/Douglas B. Janney III
Douglas B. Janney III

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry No. | Description of Document | Page ID # |
|---|---|---|
| 1 | Complaint | 1-6 |
| 24 | Motion for Summary Judgment | 157-59 |
| 25 | Memorandum in Support of Motion for Summary Judgment | 160-80 |
| 31 | Response to Motion for Summary Judgment | 349-72 |
| 32 | Response to Statement of Undisputed Facts | 373-98 |
| 33-1 | Smith Deposition Transcript | 401-510 |
| 33-2 | Sneed Deposition Transcript | 511-715 |
| 33-3 | Sneed Deposition Exhibit 3 | 716-846 |
| 33-4 | Rule 30(b)(6)/Wright Deposition Transcript | 847-72 |
| 33-5 | Rule 30(b)(6) Notice of Deposition | 873-77 |
| 33-6 | Emails with Omnitracs' Counsel | 878-80 |
| 34 | Proof of Service and Subpoena to Omnitracs | 881-85 |
| 35 | Proof of Service and Subpoena to Omnitracs' Registered Agent | 886-88 |
| 37 | Response to Statement of Additional Material Facts | 900-20 |
| 39 | Reply to Response to Motion for Summary Judgment | 930-37 |
| 43 | Memorandum Opinion of District Court | 943-1031 |
| 44 | Order granting Motion for Summary Judgment | 1032 |
| 46 | Notice of Appeal | 1034-35 |