No. 24-5549
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

THOMAS MICHAEL SMITH and
MONALETO SNEED,
     Plaintiffs-Appellants,

v.

P.A.M. TRANSPORT, INC.,
     Defendant-Appellee.
_____

On Appeal from the United States District Court
for the Middle District of Tennessee – Nashville Division
Hon. Eli Richardson, District Judge
No. 3:21-cv-262
_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFFS-APPELLANTS AND IN FAVOR OF REVERSAL
_____

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

JEREMY D. HOROWITZ
TARA PATEL
Attorneys

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
Tara.Patel@EEOC.gov

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Statement of Interest ................................................................................ 1

Statement of the Issues ............................................................................ 2

Statement of the Case .............................................................................. 2

  A.  Statement of the Facts ...................................................................... 2

  B.  District Court's Decision.................................................................... 6

Argument .................................................................................................. 11

  I.  A reasonable jury could find that PAM subjected Plaintiffs to a
     hostile work environment where supervisors repeatedly called them
     "monkey ass" while subjecting them to cursing, screaming, belittling,
     and threats. ......................................................................................... 11

    A.  A reasonable jury could find that a supervisor repeatedly calling an
       African-American employee "monkey ass" constitutes race-based
       harassment...................................................................................... 13

    B.  A reasonable jury could find the cumulative harassment Plaintiffs
       experienced—supervisors repeatedly calling them "monkey ass"
       while berating and threatening them—sufficiently severe or
       pervasive. ....................................................................................... 18

  II.  The district court erred in holding that "employment-related actions"
     can never support a hostile-work-environment claim.......................... 26

III. The district court erred in *sua sponte* rejecting Plaintiffs' identification of white comparators and in requiring Plaintiffs to proffer evidence, beyond their own perception, that their comparators were non-African American...........................................................................................28

Conclusion..............................................................................................34

Certificate of Compliance .....................................................................36

Certificate of Service

Addendum

    Designation of Relevant Documents…………………………………A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Austal, U.S.A., L.L.C.,*
    754 F.3d 1240 (11th Cir. 2014)........................................................22

*Alexander v. Loc. 496, Laborers' Int'l Union of N. Am.,*
    177 F.3d 394 (6th Cir. 1999)...........................................................29

*Alston v. Town of Brookline,*
    997 F.3d 23 (1st Cir. 2021) .............................................................21

*Arsham v. Mayor & City Council of Balt.,*
    85 F. Supp. 3d 841 (D. Md. 2015) ..................................................31

*Ayissi-Etoh v. Fannie Mae,*
    712 F.3d 572 (D.C. Cir. 2013)....................................................20, 21

*Bailey v. Floyd Cnty. Bd. of Educ.,*
    106 F.3d 135 (6th Cir. 1997).........................................................32

*Banks v. Gen. Motors, LLC,*
    81 F.4th 242 (2d Cir. 2023)...........................................................14

*Barrett v. Whirlpool Corp.,*
    556 F.3d 502 (6th Cir. 2009).........................................................19

*Boyer-Liberto v. Fontainebleau Corp.,*
    786 F.3d 264 (4th Cir. 2015) (en banc)........................................22

*Burlington Indus., Inc. v. Ellerth,*
    524 U.S. 742 (1998)......................................................................23

*Castleberry v. STI Grp.,*
    863 F.3d 259 (3d Cir. 2017) ..........................................................21

*Chattman v. Toho Tenax Am., Inc.*,
686 F.3d 339 (6th Cir. 2012) ................................................................. 6

*Clark v. United Parcel Serv., Inc.*,
400 F.3d 341 (6th Cir. 2005) .............................................................. 12

*Cooper v. Harris*,
581 U.S. 285 (2017) ............................................................................ 29

*EEOC v. Harbert-Yeargin, Inc.*,
266 F.3d 498 (6th Cir. 2001) .............................................................. 16

*EEOC v. WC&M Enters., Inc.*,
496 F.3d 393 (5th Cir. 2007) .............................................................. 31

*Ejikeme v. Violet*,
307 F. App'x 944 (6th Cir. 2009) ....................................................... 26

*Ellis v. Houston*,
742 F.3d 307 (8th Cir. 2014) .............................................................. 21

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ............................................................................ 23

*Gallagher v. C.H. Robinson Worldwide, Inc.*,
567 F.3d 263 (6th Cir. 2009) ....................................................... 16, 17

*Gen. Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581 (2004) ............................................................................ 29

*Green v. Brennan*,
578 U.S. 547 (2016) ............................................................................ 29

*Green v. Franklin Nat'l Bank of Minneapolis*,
459 F.3d 903 (8th Cir. 2006) ..................................... 13, 14, 22, 25

*Harris v. Forklift Sys., Inc.*,
510 U.S. 17 (1993) ....................................................... 12, 19, 31

*Henry v. CorpCar Servs. Hous., Ltd.*,
625 F. App'x 607 (5th Cir. 2015) ....................................................... 14

iv

*Hicks v. Gates Rubber Co.*,
  833 F.2d 1406 (10th Cir. 1987)........................................................24

*Jackson v. Quanex Corp.*,
  191 F.3d 647 (6th Cir. 1999)...........................................................6

*Johnson v. Ford Motor Co.*,
  13 F.4th 493 (6th Cir. 2021)...........................................................18

*Johnson v. United Parcel Serv., Inc.*,
  117 F. App'x 444 (6th Cir. 2004) ...........................................23, 24

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012)...............................................14, 31

*Jordan v. City of Cleveland*,
  464 F.3d 584 (6th Cir. 2006)............................................14, 18, 25

*Kengerski v. Harper*,
  6 F.4th 531 (3d Cir. 2021) .............................................................14

*Ladd v. Grand Trunk W. R.R.*,
  552 F.3d 495 (6th Cir. 2009) .........................................................12

*Lounds v. Lincare, Inc.*,
  812 F.3d 1208 (10th Cir. 2015) ...............................................17, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)........................................................................34

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)........................................................................29

*McGinest v. GTE Serv. Corp.*,
  360 F.3d 1103 (9th Cir. 2004).......................................................21

*McNeal v. City of Blue Ash*,
  – F.4th –, 2024 WL 4262532 (6th Cir. Sept. 23, 2024) .............27, 28

*Miller-El v. Cockrell*,
  537 U.S. 322 (2003)........................................................................29

*Mitchell v. Toledo Hosp.*,
   964 F.2d 577 (6th Cir. 1992) .................................................................29

*Ogbonna-McGruder v. Austin Peay State Univ.*,
   91 F.4th 833 (6th Cir. 2024) .........................................................27, 28

*Ogbonna-McGruder v. Austin Peay State Univ.*,
   No. 3:21-CV-00506, 2023 WL 3572891 (M.D. Tenn. May 19,
   2023) ......................................................................................................27

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ...........................................................16, 17, 19

*Rasmy v. Marriott Int'l, Inc.*,
   952 F.3d 379 (2d Cir. 2020) ..............................................................25

*Reed v. Procter & Gamble Mfg. Co.*,
   556 F. App'x 421 (6th Cir. 2014) ......................................................20

*Rivera v. Rochester Genesee Reg'l Transp. Auth.*,
   743 F.3d 11 (2d Cir. 2014) ................................................................21

*Rodgers v. W.-S. Life Ins. Co.*,
   12 F.3d 668 (7th Cir. 1993) ...............................................................21

*Ross v. Pfizer, Inc.*,
   375 F. App'x 450 (6th Cir. 2010) ......................................................15

*Sagan v. United States*,
   342 F.3d 493 (6th Cir. 2003) .............................................................33

*Scaife v. U.S. Dep't of Veterans Affs.*,
   49 F.4th 1109 (7th Cir. 2022) ...........................................................21

*Schlosser v. VRHabilis, LLC*,
   113 F.4th 674 (6th Cir. 2024) ............................................................25

*Spriggs v. Diamond Auto Glass*,
   242 F.3d 179 (4th Cir. 2001) ...........................................13, 14, 21, 22

vi

*Threat v. City of Cleveland,*
　6 F.4th 672 (6th Cir. 2021) ...............................................................29

*United States v. Hickey,*
　917 F.2d 901 (6th Cir. 1990) .............................................................32

*United States v. Jones,*
　159 F.3d 969 (6th Cir. 1998) .............................................................14

*United States v. Joy,*
　192 F.3d 761 (7th Cir. 1999) .............................................................32

*Waldo v. Consumers Energy Co.,*
　726 F.3d 802 (6th Cir. 2013) .............................................................25

*Walker v. Ford Motor Co.,*
　684 F.2d 1355 (11th Cir. 1982) .........................................................17

*Wanchik v. Great Lakes Health Plan, Inc.,*
　6 F. App'x 252 (6th Cir. 2002) ..........................................................20

*White v. BFI Waste Servs., LLC,*
　375 F.3d 288 (4th Cir. 2004) .............................................................14

*Williams v. CSX Transp. Co.,*
　643 F.3d 502 (6th Cir. 2011) ...........................................7, 13, 19, 24

*Williams v. Gen. Motors Corp.,*
　187 F.3d 553 (6th Cir. 1999) ...............................................12, 19, 25

*Woods v. Cantrell,*
　29 F.4th 284 (5th Cir. 2022) ........................................................14, 21

*Wyatt v. Nissan N. Am., Inc.,*
　999 F.3d 400 (6th Cir. 2021) .............................................................32

## Statutes

42 U.S.C. § 1981 ....................................................................................6

42 U.S.C. § 2000e-2(a)(1) .............................................................11, 30

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.................................................................................................*passim*

Tenn. Code § 4-21-101, *et seq*.................................................................6

## Rules & Regulations

29 C.F.R. § 1604.11(a) ...........................................................................17

Fed. R. App. P. 29(a)(2)............................................................................1

Fed. R. Civ. P. 56..................................................................................32

Fed. R. Evid. 602..............................................................................32, 33

Fed. R. Evid. 701..................................................................................33

## Other Authorities

EEOC Compliance Manual § 15-II, 2006 WL 4673425 (2006) .........................29

EEOC Compliance Manual § 15-VII.A.2, 2006 WL 4673430 (2006).................................................................................................22

EEOC, Enforcement Guidance on Harassment in the Workplace (Apr. 29, 2024), www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace#_Toc164808010 ...........................................16, 17, 25

## STATEMENT OF INTEREST

Congress charged the Equal Employment Opportunity Commission (EEOC) with administering and enforcing federal laws prohibiting workplace discrimination, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* The district court committed several legal errors with respect to Plaintiffs' hostile-work-environment claims: it concluded that no reasonable jury could find that supervisors' repeated use of the slur "monkey ass" towards Plaintiffs was either race-based or sufficiently severe or pervasive to constitute actionable harassment; it held that all discrete employment actions must be excluded from the hostile-work-environment analysis; and it rejected Plaintiffs' identification of white comparators because Plaintiffs did not specify they were "non-African American." Because the EEOC has a strong interest in the proper application of Title VII, it offers its views to the Court. *See* Fed. R. App. P. 29(a)(2).

## STATEMENT OF THE ISSUES[1]

1. Could a reasonable jury find that supervisors repeatedly calling African-American employees "monkey ass" while berating and threatening them constitutes race-based harassment that is sufficiently severe or pervasive to create a hostile work environment?

2. Did the district court err in holding that a discrete employment-related action can never support a hostile-work-environment claim?

3. Where the African-American Plaintiffs alleged race discrimination and harassment, did the district court err in *sua sponte* rejecting Plaintiffs' proffered white comparators and requiring Plaintiffs to provide evidence of their comparators' race beyond their own perceptions?

## STATEMENT OF THE CASE

### A.   Statement of the Facts

Plaintiffs Sneed and Smith, who are both African American, worked as truck drivers for Defendant P.A.M. Transport ("PAM"), a transportation company. R.25-2/Wright Decl.¶¶4,9-10/PageID#221-22; R.33-1/Smith Dep./PageID#473. Sneed worked at PAM from February 2019 to April 2020, and Smith worked at PAM from October 2018 to April 2019. R.25-

---

[1] The EEOC takes no position on any other issue in this appeal.

2/Wright Decl.¶¶9-10/PageID#222. Both were assigned to PAM's Whites Creek location in Tennessee. R.25-2/Wright Decl.¶12/PageID#223. Ten to fifteen drivers—both African Americans and non-African Americans—made up the Whites Creek driving force. R.33-1/Smith Dep./PageID#443-44; R.33-2/Sneed Dep./PageID#576-78; R.33-4/Wright Dep./PageID#850,858; R.25-2/Wright Decl.¶5/PageID#221-22.

Driver Manager/Dispatcher Jermaine Davis, who is also African American, supervised Sneed and Smith. R.33-4/Wright Dep./PageID#841; R.25-2/Wright Decl.¶11/PageID#22-23. Operations Manager Jordan Claytor supervised Davis. R.33-4/Wright Dep./PageID#841. Davis (and sometimes Claytor) assigned Plaintiffs' routes, the number of loads they took on, and the trucks they drove. R.25-2/Wright Decl.¶11/PageID#22-23; R.33-2/Sneed Dep./PageID#574-75,606; R.33-1/Smith Dep./PageID#439. Assignments occurred daily. R.33-2/Sneed Dep./PageID#602-03; R.33-1/Smith Dep./PageID#439. The supervisors also evaluated Plaintiffs' performance. R.33-3/Sneed Dep. Ex.3/PageID#104; R.25-7/ Qualcomm Messages/PageID#276-77.

Plaintiffs argued that, compared to non-African American drivers, PAM provided them less training, did not grant them time off, and

assigned them less desirable, longer routes and older trucks with more mileage. R.31/Pls. Opp./PageID#350-52,359-60,369. They also argued that PAM effectively paid them less due to their route assignments, which required them to work more hours for the same pay. *Id.*

In addition, Plaintiffs testified that Davis repeatedly called them "monkey ass" as part of a pattern of abuse that included profanity, screaming, belittling, berating, and threats. R.33-2/Sneed Dep./PageID#663-65; R.33-1/Smith Dep./PageID#447,454-56,495. For instance, Davis would call Smith "monkey ass" while criticizing his productivity and threatening him with termination or no pay. R.33-1/Smith Dep./PageID#454,458. Smith testified that the slur was particularly embarrassing when other employees overheard Davis using it to describe him. *Id.* at PageID#495. Sneed, for his part, testified that Davis told him "to get [his] monkey A-S-S out there and do the job" or else get written up. R.33-2/Sneed Dep./PageID#663. He also testified that Claytor, too, called him "Monkey Ass." *Id.* at PageID#663-65. In addition to the slurs, both supervisors "criticized," "belittled," "threatened," and "cuss[ed]" and "scream[ed]" at Sneed more generally—for instance, telling

4

him to "fuck…get your ass up…I need another load out of your ass." *Id.* at
PageID#635-36,641-42,662-66.

Smith testified that Davis's overall communication with non-African
American drivers differed in tone and language. Davis would
"force[fully]" "tell" Smith to do things and threaten him with no pay if he
failed to do so, but he would "ask" non-African American drivers to do
things, maintaining a "professional" tone—"how it should be done." R.33-
1/Smith Dep./PageID#447-48,453-58,476-79. Such interactions, according
to Smith, lowered his morale over time and became "unbearable." *Id.* at
PageID#456-59,495-96. Sneed, too, testified that that such interactions
"kill[ed his] morale" and made him more anxious. R.33-2/Sneed
Dep./PageID#642-45.

Smith repeatedly reported Davis's conduct to James Brown, a Driver
Liaison. R.33-1/Smith Dep./PageID#445-48,464,477; R.33-4/Wright
Dep./PageID#863. Driver Liaisons helped "with driver issues" and "driver
counseling." R.33-4/Wright Dep./PageID#861. Brown assured Smith that
he would look into Smith's complaints, but "nothing was ever done." R.33-
1/Smith Dep./PageID#464-65,477-48.

Sneed testified that he reported discriminatory conduct to driver liaisons and managers. R.33-2/Sneed Dep./PageID#614-21,629,684-87; R.33-4/Wright Dep./PageID#854,861-63. But according to Sneed, PAM did nothing about his complaints. R.33-2/Sneed Dep./PageID#619.

Smith ultimately left PAM in 2019 because he "got fed up with … the racial[] working conditions," which became "unbearable." R.33-1/Smith Dep./PageID#459. PAM terminated Sneed in April 2020; Sneed claims that PAM terminated him in retaliation for his complaints, whereas PAM argues that it was for performance issues. R.33-2/Sneed Dep./PageID#667-68; R.25-2/Wright Decl.¶¶9,23/PageID#222,225. Sneed and Smith timely filed suit.[2]

## B.   District Court's Decision

The district court granted PAM's summary-judgment motion in full. As to Plaintiffs' race-discrimination and hostile-work-environment claims, the court concluded *sua sponte* that Plaintiffs had not identified valid

---

[2] Sneed brought his claims under Title VII and the Tennessee Human Rights Act ("THRA"); Smith brought his claims under 42 U.S.C. § 1981. This Court interprets the relevant provisions of Title VII, the THRA, and § 1981 identically. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999); *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012).

comparators for two reasons.[3] The court first faulted Plaintiffs for referring

to their proposed comparators in deposition testimony as "white" rather

than "non-African American." *See* R.43/Dist. Ct. Op. ("Op.")/PageID#981-

82,999 n.71,1006 n.80,1008. It explained that the terms are "not

synonymous" because someone "can identify as African American and yet

have genes that overwhelmingly are associated in the popular mind with

being white," or someone "can be ostensibly 'white' and yet have enough

African DNA that they may choose to identify as African American." *Id.* at

981-82. The distinction matters, reasoned the court, because

"discrimination based on color is distinct from discrimination based on

---

[3] The court held that Plaintiffs' identification of proper comparators was
relevant to both claims. For a race-discrimination claim, the court held that
a plaintiff using indirect evidence must compare himself to a similarly
situated individual outside his protected class. R.43/Op./PageID#960-61.
For a hostile-work-environment claim, the court held that a plaintiff could
prove that "harassment was based on race" by adducing "'comparative
evidence about how the alleged harasser treated members of both races in a
mixed-race workplace.'" *Id.* at 1026 (quoting *Williams v. CSX Transp. Co.*,
643 F.3d 502, 511 (6th Cir. 2011)). It therefore used the same analysis
regarding Plaintiffs' failure to identify appropriate comparators for both
claims. *Compare, e.g.*, *id.* at 981-83, 1005-06, 1008 (race-discrimination
analysis) *with id.* at 1028, 995-96 nn.68-69, 999, 1003 n.77 (hostile-work-
environment/constructive-discharge analysis); *see also infra* n.4 (noting
overlap between the court's hostile-work-environment and constructive-
discharge analysis). Thus, we reference both sections of the opinion.

race," and Plaintiffs alleged only the latter. *Id.* at 983 n.57. To hold otherwise would "countenance the outdated and scientifically, sociologically, and evidentially unsound notion that being African American and being perceivable by a particular plaintiff as 'white' are mutually exclusive." *Id.* at 982.

The court next faulted Plaintiffs for failing to establish that their proposed comparators were, in fact, non-African American. According to the court, "mere assertion[s]" that Plaintiffs "perceived" their comparators to be non-African American was inadmissible and insufficient: Plaintiffs had to offer evidence tending to establish the fact of their comparators' race, such as an admission from PAM or a statement from the comparators. *Id.* at 983-84 & n.57; *see also id.* at 999 n.71,1003 n.77,1005-06 & n.80,1008,1027. The court also concluded that Smith failed to establish he was constructively discharged because he did not show the harassment he experienced was either based on race or sufficient "to *compel* resignation." *Id.* at 1003.

In assessing the merits of Plaintiffs' hostile-work-environment claims,[4] the court excised from its analysis Plaintiffs' allegations regarding route assignments/discriminatory pay differentials. *Id.* at 1024-25; *see also id.* at 995-96. It held that no "actual *employment-related*" action could factor into the analysis because hostile-work-environment claims are concerned with "harassment in the sense of intimidation, ridicule, and insult (and the like)," and employment-related actions "simply do not fit this description." *Id.* at 1024-25.

Next, the court held that Plaintiffs failed to show that any harassment they experienced was because of their race. "Putting aside … Defendant's alleged use of 'monkey ass,'" no reasonable jury "could conclude that Davis and Claytor's alleged 'cuss[ing], scream[ing], criticiz[ing], belittl[ing], talk[ing] down to, and threaten[ing comments]' was based on Plaintiffs' race." *Id.* at 1026 (alterations in original). And as explained

---

[4] The court offered much of its hostile-work-environment analysis when discussing constructive discharge. *See id.* at 1025 n.94 ("[T]he Court's analysis with respect to Plaintiffs' claim of hostile work environment … looks quite similar to its analysis of Smith's constructive discharge."); *compare id.* at 996-1003 (constructive discharge) *with id.* at 1025-30 (hostile work environment). We therefore refer to both sections of the opinion when addressing the court's hostile-work-environment analysis.

above, the court held that Plaintiffs' observations did not "establish[] a basis for personal knowledge" that drivers whom Davis spoke to "more professional[ly]" were in fact non-African American. *Id.* at 1027 (alterations in original).

The court separately rejected Plaintiffs' argument that the supervisors' use of "monkey ass" was evidence of race-based harassment. The term was "perhaps unprofessional," but not necessarily racist: "Any discriminatory animus motivating" its use "can be drawn—if at all—only by inference." *Id.* at 1001-02,1028. Because Plaintiffs did not produce evidence showing Davis and Claytor used the term "to refer only to African American employees," and because Davis was himself African American, the court concluded there was insufficient evidence to show its use was race-based. *Id.* at 1028, 1003 & n.77.

Finally, the court held that even assuming the existence of race-based harassment, Plaintiffs failed to show the harassment was severe or pervasive. *Id.* at 1028-30. The court concluded there was no evidence that "monkey ass" was used frequently or in a particularly humiliating context. *Id.* at 1029-30. Nor did it fall into the "narrow category" of the "select few words [that] are so vile that a single utterance" can create a hostile work

environment—rather, the comments were "mere offensive utterances, which are not actionable under Title VII." *Id.* (citation and quotation marks omitted).

## ARGUMENT

Contrary to the court's conclusion, a reasonable jury could find that supervisors repeatedly calling Plaintiffs "monkey ass" as part of a general pattern of abuse both constituted race-based harassment and was sufficiently severe or pervasive to alter the terms or conditions of their employment. The court also erred in holding that discrete employment-related acts cannot support a hostile-work-environment claim. Finally, the court erred in requiring that Plaintiffs identify "non-African American" rather than "white" comparators, and in rejecting as inadmissible Plaintiffs' evidence of their perception of their comparators' race.

**I.    A reasonable jury could find that PAM subjected Plaintiffs to a hostile work environment where supervisors repeatedly called them "monkey ass" while subjecting them to cursing, screaming, belittling, and threats.**

Title VII bars race discrimination in the "terms [or] conditions … of employment." 42 U.S.C. § 2000e-2(a)(1). Because it is intended "to strike at the entire spectrum of disparate treatment … in employment," the statute

11

prohibits "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation omitted). To prevail on a race-based hostile-work-environment claim, a plaintiff must demonstrate that (1) he belonged to a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was race-based, (4) the harassment was sufficiently severe or pervasive to alter his conditions of employment and create an abusive working environment, and (5) his employer was liable. *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 500 (6th Cir. 2009); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999).

The first two elements are undisputed; the district court addressed only the third and fourth.[5] Contrary to the court's conclusion, a reasonable

---

[5] PAM also argued it was entitled to the affirmative defense to vicarious liability because Plaintiffs received a copy of its anti-discrimination policies but failed to complain to its HR department. The district court declined to address the issue. R.43/Op./PageID#1026 n.95. If PAM renews that argument on appeal, this Court should hold that PAM was not entitled to the affirmative defense at the summary judgment stage because it produced no evidence to show that its policy was effective. PAM did not explain, for instance, what the policy included, what it required of PAM's supervisors, the specific steps PAM took to implement the policy, or what training (if any) PAM provided regarding the policy. *See Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 349 (6th Cir. 2005) ("Prong one of the affirmative defense requires an inquiry that looks behind the face of a

jury could find that the harassing conduct Plaintiffs experienced was both based on race and sufficiently severe or pervasive.

### A. A reasonable jury could find that a supervisor repeatedly calling an African-American employee "monkey ass" constitutes race-based harassment.

A plaintiff can establish race-based harassment by, among other things, presenting "direct evidence of the use of race-specific and derogatory terms." *Williams*, 643 F.3d at 511. Contrary to the district court's conclusion, a reasonable jury could find the term "monkey ass" decidedly race-specific and derogatory.

"[U]se of the word 'monkey' to describe African Americans [is] similarly odious" to the n-word, which is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001); *see also Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) (calling African Americans "monkeys" is "roughly equivalent to" using the n-word). As the Fourth Circuit explained, "[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and

---

policy to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior.").

humiliating in the extreme." *Spriggs*, 242 F.3d at 185; *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023) ("Courts have … held that use of the word 'monkey' or derivative terms … within the workplace constitutes compelling evidence of a racially hostile work environment."); *Kengerski v. Harper*, 6 F.4th 531, 539 (3d Cir. 2021) (similar); *Jordan v. City of Cleveland*, 464 F.3d 584, 596-97 (6th Cir. 2006) (jury could find race-based harassment where, among other things, "[m]ost black firefighters were stationed at 'Monkey Island'").[6]

The fact that "African-Americans have historically been subjected to [gorilla and monkey] comparisons" would further allow a jury to find that supervisors subjected Plaintiffs to a race-based slur. *Henry v. CorpCar Servs. Hous., Ltd.*, 625 F. App'x 607, 612 (5th Cir. 2015); *see also Green*, 459 F.3d at 911 ("Primate rhetoric has been used to intimidate African-Americans…."); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (surveying examples of actionable race-harassment claims premised on the comparison of African Americans to monkeys); *cf. United States v. Jones*, 159

---

[6] That "monkey" and the n-word are often used in tandem underscores the fact that "monkey" may reasonably be understood as a racist insult. *See, e.g.*, *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004); *Spriggs*, 242 F.3d at 182, 185.

F.3d 969, 977 (6th Cir. 1998) ("[I]t is a reasonable—perhaps even an obvious—conclusion that" the use of monkey imagery is intended as a "racial insult" given "the history of racial stereotypes against African–Americans and the prevalent one of African-Americans as animals or monkeys."); *Ross v. Pfizer, Inc.*, 375 F. App'x 450, 452, 454-55 (6th Cir. 2010) (acknowledging that monkey imagery carried "racial connotation[s]" that, in context, "could lead one to conclude that the speaker was motivated by racial animus," though finding the idiom "monkey on the back" in reference to a difficult project did not have racial implications).

In light of the extensive precedent addressing monkey-based rhetoric, and because PAM offered no benign explanation for its supervisors calling Sneed and Smith "monkey ass," a jury could readily find that the epithet constitutes race-based harassment. The district court thus erred in concluding that Plaintiffs did not raise a jury question about whether Davis's and Claytor's repeated use of the term was based on race. R.43/Op./PageID#1028.

The district court also erred in discounting Davis's use of the slur because Davis "was himself African-American." *Id.* at 1003. "Since the 1970s … there have been cases holding that Title VII can be violated by

15

members of the same race or sex as the victim of discrimination." *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 513 (6th Cir. 2001); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (victim and discriminator may belong to the same protected group); EEOC, Enforcement Guidance on Harassment in the Workplace, § II.A.10 (Apr. 29, 2024) ("Harassment Guidance"), www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace#_Toc164808010 ("Harassment that is based on the complainant's protected characteristic is covered even if the harasser is a member of the same protected class….").

The court also concluded that Plaintiffs had not demonstrated that "monkey ass" was a race-based slur in part because they did not show that the supervisors used it "to refer only to African American employees." R.43/Op./PageID#1003 n.77. But where harassment is "patently degrading of" African Americans, the harasser's motive and the potential exposure of others outside the protected group to the conduct are irrelevant. *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009). The question is whether the harassment subjects members of one protected group to comparatively disadvantageous terms or conditions of

employment. *Oncale*, 523 U.S. at 80; *see also* 29 C.F.R. § 1604.11(a) (harassment includes "conduct [that] has the purpose *or effect* of … creating an intimidating, hostile, or offensive working environment." (emphasis added)). Because a slur like "monkey ass" targets African Americans, it "stands to reason" that they "would suffer, as a result of the exposure, greater disadvantage in the terms and conditions of their employment" than non-African Americans. *Gallagher*, 567 F.3d at 271; *see also Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982) (use of "n****r-rigged" and "black ass" supported a race-based hostile-work-environment claim even if they were not "intended to carry racial overtones"); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1228-31 (10th Cir. 2015) (error to focus on the "ostensibly benign motivation or intent" of the alleged harassers rather than the environmental effect of offensive race-based conduct); Harassment Guidance § II.B.2 ("Conduct that explicitly insults or threatens an individual based on a protected characteristic … discriminates on that basis. The motive of the individual engaging in such conduct is not relevant to whether the conduct is facially discriminatory.").

Even on its own terms, moreover, the district court's approach was flawed because it required Plaintiffs to prove the negative proposition that

the harassing supervisors never used "monkey ass" to refer to non-African Americans. This held Plaintiffs to an impossible standard of proof, as the court itself recognized. R.43/Op./PageID#1003 n.77 (admitting that such a showing "would be difficult," in part because Plaintiffs "were not within earshot of every conversation" between the harassers and the proposed comparators).

### B. A reasonable jury could find the cumulative harassment Plaintiffs experienced—supervisors repeatedly calling them "monkey ass" while berating and threatening them—sufficiently severe or pervasive.

The district court was also wrong to minimize the seriousness of the slur "monkey ass" and to consider it separately from other harassing supervisory behavior when finding the harassment insufficient as a matter of law. A reasonable jury could conclude that the harassment, particularly when considered in its full context, was sufficiently severe or pervasive to support a hostile-work-environment claim.

Whether harassment is sufficiently severe or pervasive is "quintessentially a question of fact." *Jordan*, 464 F.3d at 597 (citation omitted). Because courts "look at the totality of the circumstances," *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021), they "must consider

18

harassment 'by all perpetrators combined,' rather than 'divid[ing] and categoriz[ing] the reported incidents.'" *Williams*, 643 F.3d at 511 (alterations in original) (citation omitted). Such a totality approach is essential: "Divorcing [incidents] from their context … depriv[es] them of their full force." *Gen. Motors Corp.*, 187 F.3d at 562; *see also Oncale*, 523 U.S. at 81-82 ("[T]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Relevant considerations "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "[N]o single factor is required." *Id.*

A plaintiff can succeed by showing that the harassment was severe, pervasive, or both. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009).[7] "The required showing of severity or seriousness of the harassing

---

[7] Although the district court provided the appropriate "severe or pervasive" formulation in parts of its opinion, *see* R.43/Op./PageID#1023,

conduct varies inversely with the pervasiveness or frequency of the conduct." *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 263 (6th Cir. 2002) (alteration and citation omitted). This Court has "not exclude[d] the possibility that only one or two incidents of race-based harassment may be so severe as to constitute a hostile work environment." *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 n.2 (6th Cir. 2014) (favorably citing *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 575, 577 (D.C. Cir. 2013), in which the court held that supervisor's one-time use of a racial slur could establish a hostile work environment).

Here, the district court chided Plaintiffs for not specifying how often their supervisors used the term "monkey ass," and concluded that the slur was not, as a matter of law, one of the "select few words [that] are so vile that a single utterance can alter the conditions of employment and thus create a hostile work environment," R.43/Op./PageID#1002 & n.76, 1029-30. To the contrary, a reasonable jury could find that even limited use of the "monkey-ass" epithet is far more than a "mere offensive utterance[]" and sufficient to establish a hostile work environment. *Id.* at 1030.

---

it elsewhere incorrectly characterized the standard as "severe *and* pervasive." *Id.* at 999 n.70 (emphasis added); *id.* at 1030 (same).

As nearly every circuit has observed, "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the n-word] by a supervisor in the presence of his subordinates." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (citation and quotation marks omitted); *accord Alston v. Town of Brookline*, 997 F.3d 23, 47 (1st Cir. 2021); *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)*; Castleberry v. STI Grp.*, 863 F.3d 259, 265 (3d Cir. 2017); *Spriggs*, 242 F.3d at 185; *Woods*, 29 F.4th at 285; *Ellis v. Houston*, 742 F.3d 307, 325 (8th Cir. 2014); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *Lounds*, 812 F.3d at 1230; *Ayissi-Etoh*, 712 F.3d at 577. Numerous circuits have therefore concluded that even the one-time use of the n-word can establish a hostile work environment. *See, e.g.*, *Woods*, 29 F.4th at 285; *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022); *Castleberry*, 863 F.3d at 264-65; *Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J. concurring) (explicitly rejecting defendant's argument that a "singular comment" is "insufficient to establish an actionable hostile work environment").

21

Again, the term "monkey" is "similarly odious."[8] *Spriggs*, 242 F.3d at 185; *see also Green*, 459 F.3d at 911. Courts have thus held it is an "unambiguously racial epithet" meriting similar treatment. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc); *see also supra* pp. 13-15. For example, the Fourth Circuit concluded that "a reasonable jury could find [a manager's] two uses of the 'porch monkey' epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — were severe enough to engender a hostile work environment." *Boyer-Liberto*, 786 F.3d at 280. Similarly, in *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014), the Eleventh Circuit held that although the carving of the racist slur "porch monkeys" into a workplace wall "was an isolated act," it was nevertheless "severe." *See also* EEOC Compliance Manual § 15-VII.A.2, 2006 WL 4673430 (2006) ("[A] single, extremely serious incident" — such as "an unambiguous racial epithet" or "a racial comparison to an animal" — "may be sufficient to constitute a Title VII violation").

---

[8] This observation applies with equal force to its derogatory derivative, "monkey ass."

The district court also neglected to account for contextual aspects that made the slurs especially harmful. First, it failed to consider that the slurs were used by supervisors who spoke with Plaintiffs daily and oversaw their day-to-day work, including assignment of vehicles, routes, and loads. R.25-2/Wright Decl.¶11/PageID#223; R.33-2/Sneed Dep./PageID#574-75,603-606; R.33-1/Smith Dep./PageID#439. These same supervisors meted out discipline and conducted Plaintiffs' evaluations, which, according to PAM, led directly to Sneed's termination. R.33-3/Sneed Dep. Ex.3/PageID#819,821; R.25-7/Qualcomm Messages/PageID#276-77; R.25-2/Wright Decl.¶23/PageID#225. As this Court has emphasized, the severity of racial epithets "greatly increase[s]" when uttered by a manager. *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004). Other courts agree. *See supra* p. 21; *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character."); *Faragher v. City of Boca Raton,* 524 U.S. 775, 803 (1998) (recognizing that employees cannot walk away when their supervisor is the harasser).

In addition, the district court ignored that supervisors specifically targeted Plaintiffs with the slurs. This Court has held that, although

offensive comments "need not be 'directed at' a plaintiff" or witnessed first-hand to constitute harassment, "harassment will be more severe" when they are. *Johnson*, 117 F. App'x at 456; *see also Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987) (evidence of the "general work atmosphere" and "specific hostility directed toward the plaintiff" are both important factors).

The slurs targeted at Plaintiffs were therefore of a different nature than the slur used in *Williams*, where a supervisor referred to two prominent public figures as "monkeys" in the plaintiff's presence. 643 F.3d at 506, 513. According to the *Williams* court, the statements were "plainly based on race" and "insensitive, ignorant, and bigoted." *Id.* at 512-13. But given their context and that they were mostly confined to a two-day period, the court found the comments were not, on their own, sufficiently severe or pervasive. *Id.* at 513. *Williams* is thus distinguishable.

Finally, the district court erred by isolating use of the "monkey" slurs from the supervisors' criticisms, screaming, and threats. Even though a reasonable jury could find Davis's and Claytor's repeated uses of "monkey ass" sufficiently severe or pervasive on their own, the court should have also considered the broader facts that paint a fuller picture of abuse.

Comments that are "not in themselves obviously racially motivated" may nonetheless "facilitate[] an atmosphere of intimidation that accentuate[s] the effect of … racial slurs directed at [plaintiff]." *Green*, 459 F.3d at 912; *see also Jordan*, 464 F.3d at 596 ("Facially neutral abusive conduct can support a finding of animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly discriminatory conduct." (cleaned up)); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814-15 (6th Cir. 2013) (similar); *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020) (similar); Harassment Guidance § II.B.5 ("Conduct that is neutral on its face may be linked to other conduct that is facially discriminatory, such as race-based epithets …. Facially neutral conduct therefore should not be separated from facially discriminatory conduct and then discounted as non-discriminatory."). By "[p]utting aside" the use of the slurs while evaluating the other harassing conduct "standing alone," R.43/Op./PageID#1026,1001, the court ignored the context of the epithet's use and "depriv[ed the incidents] of their full force," *Gen. Motors Corp.*, 187 F.3d at 562; *see also Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 687-88 (6th Cir. 2024) (explaining that disaggregating types of harassment "robs the incidents of their cumulative effect").

25

Moreover, the harassment that Plaintiffs endured was categorically different from the harassment the plaintiff experienced in *Ejikeme v. Violet*, 307 F. App'x 944 (6th Cir. 2009), an unpublished case on which the district court relied. In *Ejikeme*, the court held that harassment was not sufficiently severe or pervasive where the plaintiff alleged that a supervisor once referred to him as a "monkey" in a conversation with someone else, and where the supervisor separately criticized his work ability—criticisms that "appear, based on the record, to have been valid." *Id.* at 946, 949. Davis and Claytor, in contrast, repeatedly directed the "monkey ass" slur squarely at Sneed and Smith while also threatening them with no pay or termination—all while cursing and screaming at them in a way that, according to Smith, differed markedly from the "professional tone" used with non-African American drivers.

## II.   The district court erred in holding that "employment-related actions" can never support a hostile-work-environment claim.

The district court excluded Plaintiffs' discriminatory pay differential/route assignment allegations from the hostile-work-environment analysis on the basis that an "employment-related action" is not, as a matter of law, "the kind of harassment, intimidation or ridicule

26

that contributes towards a hostile work environment."

R.43/Op./PageID#1024-25 (quoting *Ogbonna-McGruder v. Austin Peay State Univ.*, No. 3:21-CV-00506, 2023 WL 3572891, at *8-10 (M.D. Tenn. May 19, 2023), *aff'd*, 91 F.4th 833 (6th Cir. 2024)). The district court was wrong to make such a categorical exclusion.

As this Court recently explained in *McNeal v. City of Blue Ash*, – F.4th –, 2024 WL 4262532, at *10 (6th Cir. Sept. 23, 2024), a discrete employment-related action—including unfavorable work assignments—can also contribute to a hostile work environment. This Court explained that "a single discrete act may contribute to different types of harms," simultaneously "caus[ing] a change in the terms or conditions of employment" and, when "deployed strategically as harassment[,] can also add to a climate of hostility that represents a different change in the terms or conditions of the job." *Id.* at 10 & n.14; *see also id.* at *11 (reading *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833 (6th Cir. 2024), to exclude discrete acts from consideration in the hostile-work-environment context only when they "do[] not 'contribut[e]' to the alleged environment of harassment" (quoting *id.* at 840)). This Court should thus reject the

district court's conclusion that employment-related actions are

categorically excluded from supporting a hostile-work-environment claim.

**III.  The district court erred in *sua sponte* rejecting Plaintiffs' identification of white comparators and in requiring Plaintiffs to proffer evidence, beyond their own perception, that their comparators were non-African American.**

The district court rejected Plaintiffs' proffered comparators. As the

court framed the issue, because Plaintiffs' "protected class is African

American—as opposed to Black, importantly—the relevant comparators …

must be *non-African American*" and not "white." R.43/Op./PageID#981; *see*

*also id.* at PageID#983 n.57 ("[B]ecause Plaintiffs have alleged

discrimination based on race rather than on color, the Court is constrained

to define the persons outside of Plaintiffs' protected class as persons who

are not African American, and not as persons who are white in skin

color."). In the court's view, Plaintiffs' identification of "white"

comparators, rather than "non-African Americans," was not sufficient

because the two are "not synonymous." *Id.* at PageID#981-82,983 n.57,996

n.69. Relatedly, because a light-skinned person perceived as "white" can be

African American, Plaintiffs needed (but failed) to establish "a basis for

personal knowledge" that the comparators they "perceiv[e] as white are in

fact not African-American." *Id.* at PageID#996 n.69,983-84,999 n.71,1006 & n.80,1027.

The district court was wrong to require Plaintiffs to identify comparators who were "non-African American" rather than "white"; "Black" and "White" may unquestionably be used as racial categories in litigating Title VII discrimination and harassment claims. Indeed, the Supreme Court and this Court routinely use the terms "Black" and "White" in this context. *See, e.g., Green v. Brennan*, 578 U.S. 547, 550 (2016); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 597-98 (2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-05 (1973); *Threat v. City of Cleveland*, 6 F.4th 672, 676-77 (6th Cir. 2021); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 579, 583 (6th Cir. 1992). And both courts routinely compare "African Americans" with "whites" to show discrimination and use "African American" and "Black" interchangeably. *See, e.g., Cooper v. Harris*, 581 U.S. 285, 302-03 (2017); *Miller-El v. Cockrell*, 537 U.S. 322, 331, 343 (2003); *Alexander v. Loc. 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 400 (6th Cir. 1999); *cf.* EEOC Compliance Manual § 15-II, 2006 WL 4673425 (2006) (explaining, under the heading "What is 'Race' Discrimination?," that OMB provides "*Black or African American*" and "*White*" as racial categories for the

collection of federal data on race, and noting that "Title VII's prohibition of race discrimination generally encompasses … physical characteristics associated with race, such as a person's color ….").

The district court, in comparison, cited no case law to support its notion that "White" and "Black" are appropriate solely as color descriptors and insufficient in the context of a race-based Title VII claim. As for PAM, it never contested the issue, and in fact uses "white" throughout its papers to describe the race of some of PAM's drivers. R.26/Def. SUMF¶¶22,23,40,42,49,66/PageID#305,308,310,312; R.25/Def. MSJ/PageID#162-166,15; R.39/Def. Reply/PageID#933-34.

More fundamentally, in requiring Plaintiffs to offer "non-African American" rather than "white" comparators, and in understanding Plaintiffs to argue that "being African American and being perceivable by a particular plaintiff as 'white' are mutually exclusive," R.43/Op./PageID#982, the court misapprehended the nature of a Title VII discrimination claim. Title VII forbids employers from "discriminat[ing] against any individual … because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Its purpose is to outlaw differential treatment on the basis of a protected characteristic. *See, e.g.*, *Harris*, 510 U.S. at 21 (explaining that

30

Congress intended Title VII "to strike at the entire spectrum of disparate treatment … in employment" (citation omitted)). Thus, if an employer treats one employee worse than another based on a real or perceived racial distinction, that is sufficient.[9] Plaintiffs need not provide evidence of the comparator's genetic composition or self-identification, as the district court required here. *See, e.g.*, R.43/Op./PageID#981-84.

The court also erred by holding that Plaintiffs failed to provide admissible and sufficient evidence that their comparators were, in fact, non-African American. According to the court, Plaintiffs were required to provide, e.g., an averment by the alleged comparators that they "actually and specifically" identify as non-African American, an admission from PAM, or "testimony from Plaintiff(s) based on personal knowledge." *Id.* at PageID#983,999 n.71.

---

[9] Indeed, the statute applies even when, for instance, the discriminator's perception regarding the protected characteristic is incorrect. *UPS Ground Freight*, 683 F.3d at 1299-1300; *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401-02 (5th Cir. 2007); *see also Arsham v. Mayor & City Council of Balt.*, 85 F. Supp. 3d 841, 845 (D. Md. 2015) (describing the argument that liability cannot attach for discrimination based on a mistaken perception about membership in a protected class as "superficially logical, but fundamentally abhorrent").

Contrary to the district court's holding, Plaintiffs' perception of their comparators' race *is* based on their personal knowledge and constitutes admissible evidence. Federal Rule of Evidence 602 requires that a witness have personal knowledge of the matter to which he testifies, which "may consist of the witness's own testimony." Fed. R. Evid. 602. "[P]ersonal knowledge includes opinions and inferences grounded in observations or other first-hand experiences," and "[t]he inferences reached … need not reach the level of absolute certainty to be admissible." *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999). The threshold for admitting testimony under Rule 602 is "low." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990).[10]

Here, the record shows that the Whites Creek driving force consisted of both African American and non-African American drivers. R.33-1/Smith

---

[10] The district court also erred in rejecting Sneed's testimony about never seeing white drivers working on Saturdays because it "lack[ed] a basis for personal knowledge and relie[d] on hearsay." R.43/Op./PageID#949 n.17, 985. Because this testimony was based on Sneed's observations, it had an evidentiary basis and did not rely on hearsay. And even if it did, Federal Rule of Civil Procedure 56 allows for the submission of hearsay evidence if the plaintiff can proffer it will be produced in an admissible form at trial. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423-24 (6th Cir. 2021); *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

Dep./PageID#443-44; R.33-2/Sneed Dep./PageID#576-78; R.25-2/Wright Decl.¶5/PageID#221-22. Plaintiffs testified that they routinely interacted with their non-African American counterparts and, based on these interactions, identified their races. *See, e.g.*, R.33-2/Sneed Dep./PageID#576-78,582-83,590-92,646-47 (testifying that he knew the other drivers in the Whites Creek location, explaining that "we'd talk all the time" and "talk on the yard," and listing drivers' races); R.33-1/Smith Dep./PageID#469-71,443-44 (explaining that he would talk to other drivers about their routes, and confirming races of certain drivers). Plaintiffs' perception of their comparators' races is thus based on their personal knowledge and constitutes admissible evidence. Fed. R. Evid. 602, 701. A reasonable jury could therefore certainly find that the comparators were non-African American—particularly given that PAM never contested the issue or offered evidence to the contrary.

In failing to credit Plaintiffs' testimony that their comparators appeared White (and therefore non-African American), the court ignored the core summary judgment tenets of viewing the record "in the light most favorable to the non-moving party" and "drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir.

33

2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). PAM could have contested the races of the comparators if it had a basis for doing so (though it made no such argument), but the court should not have assumed that the comparators were not valid based solely on the theoretical possibility that a comparator who appeared White might also be African American. *See* R.43/Op./PageID#981-84.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment on Plaintiffs' hostile-work-environment claim and remand for further proceedings.

Respectfully submitted,

KARLA GILBRIDE
General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

JEREMY D. HOROWITZ
Attorney

s/*Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel

131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
Tara.Patel@EEOC.gov

October 11, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,485 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Book Antiqua 14 point.

s/*Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
Tara.Patel@EEOC.gov

October 11, 2024

## CERTIFICATE OF SERVICE

I certify that on October 11, 2024, I electronically filed the foregoing

brief in PDF format with the Clerk of Court via the appellate CM/ECF

system. I certify that all counsel of record are registered CM/ECF users,

and service will be accomplished via the appellate CM/ECF system.


s/*Tara Patel*
TARA PATEL
Attorney
EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., 5th Floor
Washington, D.C. 20507
202-921-2770
Tara.Patel@EEOC.gov

# Addendum

Designation of Relevant District Court Documents

| Record Entry # | Document Description | Page ID # Range |
|---|---|---|
| R. 25 | Def's Memorandum in Support of Motion for Summary Judgment | 160-180 |
| R. 25-2 | Holly Wright Declaration | 221-226 |
| R. 25-7 | Exhibit E to Exhibit 2 Qualcomm Messages | 275-277 |
| R. 26 | Def's Statement of Undisputed Material Facts | 301-314 |
| R. 31 | Pls' Response in Opposition to Def's MSJ | 349-372 |
| R. 33-1 | Michael Smith Deposition Transcript | 401-510 |
| R. 33-2 | Monaleto Sneed Deposition Transcript | 511-715 |
| R. 33-3 | Monaleto Sneed Deposition Exhibit 3 | 716-846 |
| R. 33-4 | Holly Wright Deposition Transcript | 847-872 |
| R. 39 | Def's Reply in Support of Def's MSJ | 930-937 |
| R. 43 | Memorandum Opinion of the District Court | 943-1031 |