No. 24-5549

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**
_____

Thomas Michael Smith and Monaleto Sneed,
*Plaintiffs – Appellants,*

v.

PAM Transport, Inc.,
*Defendant – Appellee.*

**On Appeal from the United States District Court
for the Middle District of Tennessee**
_____

**REPLY BRIEF OF APPELLANTS
THOMAS MICHAEL SMITH and MONALETO SNEED**
_____

Douglas B. Janney III (TN BPR No. 19112)
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

Stephen W. Grace (TN BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee 37212
(615) 255-5225
sgrace@sgracelaw.com

*Counsel for Appellants
Thomas Michael Smith and Monaleto Sneed*

# TABLE OF CONTENTS

Table of Contents ………………………………………………………….……..ii

Table of Authorities ……………………………………………….....................iii

Introduction ……………………………………………………………………...1

Argument ……………………………………………………………..............3

    I.      PAM's Discriminatory Conduct and Treatment of Plaintiffs
          Contributed to the Hostile Work Environment ………………………3

    II.     PAM's Discriminatory and Abusive Comments to and
          Behavior Toward Plaintiffs Contributed to the Hostile Work
          Environment ……………………………………………………………8

    III.    The Harassment was Severe and/or Pervasive Enough to
          Create a Hostile Work Environment ………………………………..15

    IV.    PAM is Liable for the Discriminatory Harassment Plaintiffs
          Suffered ……………………………………………………………..18

Conclusion ………………………………………………………..............19

Certificate of Compliance ……………………………………………...…..20

Certificate of Service ……………………………………………………...…21

i

# TABLE OF AUTHORITIES

## Cases

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572 (D.C. Cir. 2013) ………………………..15

*Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015)……………..15

*Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998) ……………………….............16

*EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498 (6th Cir. 2001) ……………………11

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263 (6th Cir. 2009)……...12

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) …………..……….9

*Johnson v. Ford Motor Co.*, 13 F.4th 493 (6th Cir. 2021) …………………....17-18

*Johnson v. UPS*, 117 Fed. Appx. 444 (6th Cir. 2004) ……………………..…7, 9, 16

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) …………………...12

*McNeal v. City of Blue Ash*, 117 F.4th 887 (6th Cir. 2024) …………………….3, 18

*Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024) ………………………5

*Williams v. GMC*, 187 F.3d 553 (6th Cir. 1999) …………………………..……...18

*Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400 (6th Cir. 2021) …………………..........6

## Rules

Fed. R. Evid. 801(d)(2) ……………………………………………………….....6

## Other Authorities

EEOC Enforcement Guidance on Harassment in the Workplace,
§ II.A.10 (Apr. 29, 2024) …………………………………………………………11

# INTRODUCTION

Plaintiffs-Appellants Thomas Michael Smith and Monaleto Sneed (collectively "Plaintiffs") respectfully file this reply brief to address the arguments raised by Defendant-Appellee PAM Transport, Inc. ("PAM"), in its brief.

As demonstrated below, in Plaintiffs' principal brief, and in the amicus curiae brief filed by the U.S. Equal Employment Opportunity Commission ("EEOC"), the district court erred in granting summary judgment in favor of PAM on Plaintiffs' hostile work environment claims. The record demonstrates that Plaintiffs were subjected to continuous discriminatory treatment, comments, and behavior by their supervisors throughout their employment with PAM.  Viewing the facts and evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, a reasonable jury could find that the harassment was motivated by race and sufficiently severe or pervasive to create a hostile work environment.

PAM argues that Plaintiffs failed to produce any direct evidence of racially derogatory comments. Plaintiffs, however, provided testimony that their supervisors, Jermaine Davis and Jordan Claytor, repeatedly referred to them as "monkey" and "monkey ass" in a hostile and threatening manner.  These comments are racially charged and have been recognized by courts as highly offensive to

African Americans. The district court improperly disregarded this evidence by isolating the comments and failing to consider them in context.

Plaintiffs also presented comparative evidence showing that they were treated differently than their non-African American counterparts. PAM assigned Plaintiffs heavier workloads, longer routes, and excessive work hours, among other things. Non-African American drivers received shorter, more desirable routes and fewer loads and driving hours per day. This disparate treatment further supports Plaintiffs' claims that the harassment was based on race.

The district court further erred by not considering the totality of the circumstances in assessing the severity and pervasiveness of the harassment. The court improperly parsed out individual incidents rather than viewing the cumulative effect of the discriminatory conduct, comments, and behavior. The continuous and discriminatory nature of the harassment, including racial slurs, targeted hostility and abuse, excessive workloads, and different treatment, combined to create a hostile work environment.

The harassment also interfered with Plaintiffs' job performance and caused them significant emotional distress. Both Smith and Sneed testified that the discriminatory treatment affected their morale, caused anxiety, and made it more difficult for them to perform their jobs. This evidence further supports the fact that the harassment was severe and pervasive.

PAM failed to take any corrective action in response to Plaintiffs' repeated complaints of discrimination and harassment to management. Its inaction allowed the harassment to continue, rendering it liable.  PAM cannot avail itself of the *Faragher/Ellerth* affirmative defense because Plaintiffs suffered tangible employment actions.  Even if the defense were available, PAM did not exercise reasonable care to prevent and promptly correct the harassment, and Plaintiffs did not unreasonably fail to take advantage of preventive or corrective opportunities. Accordingly, Plaintiffs request that the Court reverse the judgment of the district court on their hostile work environment claims.

## ARGUMENT

### I.    PAM's Discriminatory Conduct and Treatment of Plaintiffs Contributed to the Hostile Work Environment

PAM incorrectly asserts that Plaintiffs' hostile work environment claims are based only on the fact that "1) they were paid less (relative to the amount of work completed) than their non-African American counterparts; and 2) [supervisors] Davis and Claytor spoke to them in a 'hostile and abusive manner,' by cussing, screaming, criticizing, belittling, talking down to, and threatening them, as well as referring to each of them as 'monkey ass.'" (PAM Brief at 7, 19).[1]  While these

---

[1] Like the district court in its opinion, PAM in its brief attempts to "carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode," which "is improper." *McNeal v. City of Blue Ash*, 117 F.4th 887, 905 (6th Cir. 2024) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 660

actions, behaviors, and comments were a significant part of the hostile work environment, they were not the only factors contributing to it.

The district court overlooked, and PAM failed to address, the fact that, in their response to PAM's motion for summary judgment on their hostile work environment claims, Plaintiffs argued, "*As discussed above*, throughout Plaintiffs' employment, Davis and Claytor subjected them to continuous acts of racially disparate *treatment* that *caused* them to earn less per hour than their non-African American counterparts." (RE 31, Response at 18, Page ID # 366) (emphasis added). The evidence "discussed above" included the discriminatory work assignments and driving routes, loads, and hours and other treatment that contributed to the hostile work environment. Plaintiffs exhaustively argued this in their principal brief, as well. (Pls' Brief at 5-8, 11-14, 22-30, 41-44). The discriminatory treatment was part and parcel of the hostile work environment they experienced and repeatedly complained to management about.

PAM also incorrectly asserts that "the question of whether Plaintiffs' alleged evidence of extra loads, work assignments and excessive hours supports [their] hostile work environment claims is waived." (PAM Brief at 22). As shown above, nothing could be further from the truth. The district court and PAM improperly

---

(6th Cir. 1999)). Instead, "the 'totality of the circumstances' approach requires" courts "to examine [plaintiff]'s treatment cumulatively to see whether it created an atmosphere of hostility that was more than the sum of its parts." *Id*.

conflate the discriminatory treatment that contributed to the hostile work environment with a *result* of the treatment—*i.e.*, that Plaintiffs received "less pay" per hour than non-African American drivers.

All drivers received $180 per day but Smith and Sneed worked 10 and 12 hours and had to run multiple routes per day while non-African Americans worked fewer hours and ran fewer routes. (RE 33-1, Smith Dep. 38, 46, 49, 52, 68-70, 74-75, Page ID # 438, 446, 449, 452, 468-70, 474-75; RE 33-2, Sneed Dep. 90-91, 136-37, 146-47, Page ID # 600-01, 646-47, 656-57). This additional evidence should be considered a part of the totality of the circumstances in assessing the hostile work environment. As the Court recently held in *Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024), "Although discrete acts of discrimination are not independently actionable as a hostile work environment claim, the jury may certainly consider such acts in its evaluation of the overall working environment." *Id*. at 684. It elaborated, "the supervisors' decisions about which diving role Schlosser should fulfill on the team occurred daily. . . . These everyday choices and occurrences are fairly characterized as 'repeated conduct' that contributed towards the hostile work environment." *Id*. at n. 1. The same may be said here.

PAM next incorrectly asserts that Plaintiffs' claims of discriminatory treatment are based on "unsubstantiated hearsay." (PAM Brief at 23-25). It never argued this in the district court; indeed, the word "hearsay" does not appear in its

5

summary judgment memorandum or reply brief. (RE 25, Mem., Page ID # 160-80; RE 39, Reply, Page ID # 930-37).  In any case, since Plaintiffs can subpoena white drivers like Melvin and supervisors like Davis and Claytor to testify at trial, and since PAM offered no contradictory testimony from any of the agents and employees with whom Plaintiffs testified they communicated, Plaintiffs' testimony is admissible for summary judgment purposes. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 423-24 and n.8 (6th Cir. 2021).

Furthermore, PAM admitted that its drivers "always" received $180 per day, regardless of whether it "took seven hours" or "12 hours" to complete the assigned work. (RE 33-4, Wright Dep. 20-21, Page ID # 852-53; RE 33-1, Smith Dep. 52-53, Page ID # 452-53).  It failed to address Plaintiffs' argument that their reports to its managers and the responses they received about the discriminatory work assignments, extra loads, and excessive hours resulting in less pay are not hearsay and/or are admissible under Fed. R. Evid. 801(d)(2). (Pls' Brief at 24-25).  For example, Smith's complaining "more than ten times" about "having to work more hours" than non-African American drivers and Davis' responding, "You get what you get," "That's part of it," and "Maybe you need . . . to find another job" are admissible. (RE 33-1, Smith Dep. 70, 74-75, Page ID # 470, 474-75).  So, too, are manager Jim Brown's statements to Smith that the discrimination "shouldn't be going on," that "[e]verybody should get the same treatment," that he "would check

into it," and "said he did," but "nothing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 64-65, 77-79, Page ID # 464-65, 477-79); *Johnson v. UPS*, 117 Fed. Appx. 444, 456 n. 6 (6th Cir. 2004) (applying Fed. R. Evid. 801(d)(2)).

PAM further incorrectly states that Plaintiffs did not "observe" that non-African American drivers only had to drive one load per day and were given shorter routes while they had to drive multiple loads per day and were given longer routes. (PAM Brief at 24). Regardless of what PAM's unauthenticated and inadmissible "records" allegedly show, Sneed observed—and repeatedly discussed with managers and co-workers—the fact that non-African American drivers "would go home and I would have another trip to Horse Cave where they would get in their trucks or their cars and go home." (RE 33-2, Sneed Dep. 136, Page ID # 646). He further observed non-African American drivers' receiving shorter, more desirable routes, including to nearby Clarksville, Tennessee, and Mt. Juliet, Tennessee, while he was required to make multiple trips per day to Horse Cave, Kentucky. (*Id*. at 146-47, Page ID # 656-57).

Smith likewise observed that the routes PAM assigned him were "way longer" than those it assigned to "the white drivers." (RE 33-1, Smith Dep. 68-69, Page ID # 468-69). He observed and repeatedly discussed with managers "the actual work load nobody else was getting outside of the African Americans. The longer day we was receiving" and the fact that non-African American drivers were working four

7

hours per day for $180 while he was working 10 hours per day for the same rate. (*Id*. at 46, Page ID # 446).  Plaintiffs' own observations and reports to management and their testimony about both are based on their personal knowledge and are admissible evidence of PAM's discriminatory treatment that contributed to the hostile work environment they experienced.

## II.    PAM's Discriminatory and Abusive Comments to and Behavior Toward Plaintiffs Contributed to the Hostile Work Environment

PAM next incorrectly argues that supervisors Davis' and Claytor's speaking to Plaintiffs "in a 'hostile and abusive manner,' by cussing, screaming, criticizing, belittling, talking down to, and threatening them, as well as referring to each of them as 'monkey ass'" was not "based on race." (PAM Brief 19, 28-34).  As demonstrated below, PAM's supervisors' repeatedly calling Plaintiffs "monkey" and "monkey ass" is overtly racist in nature, was offensive to them, and caused them to suffer embarrassment, humiliation, and anxiety.  Plaintiffs also heard, observed, discussed with managers, and testified about the manner in which Davis and Claytor spoke to and interacted with them and non-African American drivers.  Plaintiffs noticed that they did not treat those drivers with such hostility or discriminate against them. (RE 33-1, Smith Dep. 46-48, 53-58, 65, 76, 78, Page ID # 446-48, 453-58, 465, 476, 478; RE 33-2, Sneed Dep. 125-26, 131-32, 152-55, Page ID # 635-36, 641-42, 662-65).

Plaintiffs also communicated with each other during their employment about how they were being discriminated against and harassed because of their race. (RE

33-1, Smith Dep. 43, 55-56, 65, 86, Page ID # 443, 455-56, 465, 486; RE 33-2, Sneed Dep. 165, Page ID # 675).   This further supports their hostile work environment claims. *Johnson v. UPS*, 117 Fed. Appx. at 456 ("plaintiff need not even witness remarks or behavior first-hand in order to allege that the remarks or behavior contributed to a hostile work environment.") (quoting *Jackson*, 191 F.3d at 661); *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 335 (6th Cir. 2008) (court must "consider evidence of other acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence.").   PAM's argument that "their employment as local drivers overlapped by less than two weeks" (PAM Brief 38) does not affect their testimony about what their supervisors said and did to them throughout their employment nor does it demonstrate that they did not communicate with each other when Sneed initially worked as an over the road driver and Smith worked as a local driver.   The fact remains that, at all times during their employment, both Plaintiffs were dispatched out of the same White's Creek location; both reported to the same harassing supervisors, Davis and Claytor; and both discussed the harassment each experienced with each other. (RE 33-1, Smith Dep. 31-22, 43, 55-56, 65, 86, Page ID # 431-32, 443, 455-56, 465, 486; RE 33-2, Sneed Dep. 65-66, 165, Page ID # 575-76, 675; RE 33-4, Wright Dep. 11-15, Page ID # 850-51; RE 25-2, Wright Decl. ¶¶ 11-12, Page ID # 222-23).

Regarding its supervisors' racial slurs, PAM incorrectly asserts that Davis and Claytor did not "repeatedly" call Plaintiffs "monkey ass" and never called them "monkey." (PAM Brief at 30-31). It disingenuously—and repeatedly—asserts that "Sneed testified that Davis only called him 'monkey ass' *one time*." (*Id*. at 9, 16-17, 30, 34-35) (emphasis in original). This is not how Sneed testified; it is a dubious, at best, reading of his testimony and certainly does not construe it, and the inferences that may reasonably be drawn from it, in his favor, as is required.

To be sure, Sneed stated "one time" followed by a specific *example* of Davis' calling him "monkey ass." (RE 33-2, Sneed Dep. 153, Page ID # 663). That example, which was coupled with a threat, was: "[Y]ou're going to get your monkey A-S-S out there and do the job or . . . I'm going to write you up." (*Id*.). Sneed went on to testify, "And it was just very disturbing . . . to have people talk down on you . . . calling you a monkey ass . . . ." (*Id*. at 154, Page ID # 664). He continued, "[Claytor] *used monkey*, like Jermaine [Davis]. Monkey ass, *they used that*." (*Id*. at 155, Page ID # 665).

Smith likewise testified that Davis engaged in "'name calling.' Like the—he used the *monkey*—monkey A" and "call[ed] him outside of [his] name . . . like the *monkey*—the monkey ass." (RE 33-1, Smith Dep. 47, 54, Page ID # 447, 454). Davis also threatened Smith: "[I]f you don't do this, you're going to get . . . terminated or not get paid. Or [if] you can't do the job, you don't need to be here" and "find

10

another job." (*Id*. at 58, 74-75, Page ID # 458, 474-75).  Smith complained to manager Brown about the harassment multiple times. (RE 33-1, Smith Dep. 46-48, 54-56, Page ID # 446-48, 454-56).  Brown responded that the discrimination "shouldn't be going on," that he "would check into it," and "said he did," but "nothing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 77-79, Page ID # 477-79).

PAM next incorrectly argues that "Plaintiffs have presented no evidence that ["monkey" and "monkey ass"] is racially motivated or race specific, which would be highly suspect given that the term was allegedly directed at them by another *African-American*. (PAM Brief at 31) (emphasis in original).  It fails to mention that Claytor, who is Caucasian, also repeatedly used both terms, as set forth above. (RE 33-4, Wright Dep. 14-15, Page ID # 851).  Additionally, it is well-settled that "Title VII can be violated by members of the same race or sex as the victim of discrimination." *EEOC v. Harbert-Yeargin, Inc*., 266 F.3d 498, 513 (6th Cir. 2001); EEOC Enforcement Guidance on Harassment in the Workplace, § II.A.10 (Apr. 29, 2024) ("Harassment that is based on the complainant's protected characteristic is covered even if the harasser is a member of the same protected class").

Furthermore, as cited in Plaintiffs' and the EEOC's briefs, and contrary to PAM's bare assertions in its brief with no citations, courts across the country recognize that a supervisor's (and even a co-worker's) calling an African American

employee a "monkey," or other derivates of that word, is highly offensive to African Americans and supports a racially hostile work environment claim. *See, e.g., Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) ("'Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable—perhaps even an obvious—conclusion that' the use of monkey imagery is intended as a 'racial insult' where no benign explanation for the imagery appears.") (quoting *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998)); (Pls' Brief at 32-33) (listing cases); (EEOC Brief at 13-15, 22) (listing cases).

Moreover, a reasonable jury could conclude that Davis' and Claytor's repeatedly calling Plaintiffs "monkey" and "monkey ass"—coupled with their hostile tone, continuous verbally abusive behavior, threats regarding continued employment, and ongoing discriminatory treatment directed only at African Americans—was racially motivated. Where harassment is "explicitly [racial] and patently degrading of [African Americans]"—as courts hold the term "monkey" and its derivates to be—"the natural effect of exposure to such offensive conduct is embarrassment, humiliation and degradation, irrespective of the harasser's motivation—especially and all the more so if the captive recipient of the harassment is [African American]." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 271 (6th Cir. 2009). Smith and Sneed testified that the harassment they experienced

12

was embarrassing, humiliating, and caused anxiety. (RE 33-1, Smith Dep. 95-97, Page ID # 495-97; RE 33-2, Sneed Dep. 132-34, Page ID # 642-44).   Further, "'[race] specific' profanity is more degrading to [African Americans] than [non-African Americans] and is properly deemed 'based on [race]' for purposes of evaluating the severity and pervasiveness of the harassment." *Gallagher*, 567 F.3d at 271.

Additionally, "even non-[racially] harassing conduct may be deemed to be based on [race] if the plaintiff is otherwise able to show that, but for the fact of her [race], she would not have been the object of the harassment." *Id*.   Plaintiffs testified and argued in the district court that they observed that Davis and Claytor did not treat non-African American drivers in the hostile, abusive, and discriminatory manner in which they treated them.   In response, PAM presented no evidence that Davis and Claytor spoke to and treated non-African American drivers the same way, or that they ever called any non-African American driver "monkey" or "monkey ass."   Nor did PAM ever offer any benign explanation for its supervisors' use of the racially offensive terms, as none exists.

Regarding Plaintiffs' testimony about their own observations of how Davis and Claytor treated non-African American drivers, PAM asserts, for the first time on appeal, that Plaintiffs "lacked personal knowledge as to anyone's race" and "failed to offer any evidence that they are 'white' in race, as opposed to the color of

13

their skin being white.  Therefore, Plaintiffs offered no evidence personal knowledge [sic] to assert that Chris and Melvin are 'white' in a racial sense." (PAM Brief at 32-33).

PAM did not make this argument, or even mention it, in its summary judgment memorandum or reply brief. (RE 25, Mem., Page ID # 160-80; RE 39, Reply, Page ID # 930-37).  And the district court cited no authority for its *sua sponte* holding that Plaintiffs' observations and perceptions of their comparators' races is inadmissible or insufficient at the summary judgment stage, nor did PAM cite any in its brief.  As explained in Plaintiffs' and the EEOC's briefs, this holding was in error. (Pls' Brief at 27-28; EEOC Brief at 28-34).

As the EEOC explained, "Plaintiffs need not provide evidence of the comparator's genetic composition or self-identification, as the district court required here." (EEOC Brief at 31) (citing RE 43, Mem. Opin., Page ID # 981-84).  "Contrary to the district court's holding, Plaintiffs' perception of their comparators' race is based on their personal knowledge and constitutes admissible evidence." (*Id.* at 32) (citing Fed. R. Evid. 602; *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) ("[P]ersonal knowledge includes opinions and inferences grounded in observations or other first-hand experiences," and "[t]he inferences reached … need not reach the level of absolute certainty to be admissible.").  "Plaintiffs testified that they routinely interacted with their non-African American counterparts and, based on these

interactions, identified their races." (*Id.* at 33) (citing RE 33-2, Sneed Dep., Page ID # 576-78, 582-83, 590-92, 646-47) (testifying that he knew the other drivers in the Whites Creek location, explaining that "we'd talk all the time" and "talk on the yard," and listing drivers' races); RE 33-1, Smith Dep., Page ID # 469-71, 443-44 (explaining that he would talk to other drivers about their routes, and confirming races of certain drivers). "Plaintiffs' perception of their comparators' races is thus based on their personal knowledge and constitutes admissible evidence." (*Id.*) (citing Fed. R. Evid. 602, 701). "A reasonable jury could therefore certainly find that the comparators were non-African American—particularly given that PAM never contested the issue or offered evidence to the contrary." (*Id.*).

## III.   The Harassment was Severe and/or Pervasive Enough to Create a Hostile Work Environment

In attempting to argue that the harassment Plaintiffs experienced was neither severe nor pervasive, PAM states that "sporadic use of the term 'monkey' to refer to an employee by a manager is insufficient to create a hostile work environment." (PAM Brief at 35). PAM is incorrect. *See, e.g.*, *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 575, 577 (D.C. Cir. 2013) (holding supervisor's one-time use of a racial slur can establish a hostile work environment); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (en banc) ("a reasonable jury could find that [supervisor]'s two uses of the 'porch monkey' epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to

15

engender a hostile work environment.").  The two cases the district court and PAM cited were previously distinguished in Plaintiffs' and the EEOC's briefs. (Pls' Brief at 33-34; EEOC Brief at 24, 26).

Furthermore, Davis' and Claytor's repeatedly calling Plaintiffs "monkey" and "monkey ass" *while also* cussing, screaming, criticizing, belittling, talking down to, and *threatening them* with no pay, discipline and discharge, and not doing this to non-African American drivers, is easily sufficient to establish a genuine issues of material fact as to whether the harassment was severe or pervasive. (RE 33-1, Smith Dep. 46-48, 54-56, 95, Page ID # 446-48, 454-56, 495; RE 33-2, Sneed Dep. 153-55, Page ID # 663-65).  This is especially so since Davis and Claytor were supervisors who communicated with Plaintiffs daily and dictated their work, including their route and load assignments. (RE 25-2, Wright Decl. ¶ 11, Page ID # 223; RE 33-2, Sneed Dep., Page ID # 574-75, 603-06; RE 33-1, Smith Dep., Page ID # 439).  Davis and Claytor also administered discipline and evaluated Plaintiffs' performance, which, according to PAM, directly led to Sneed's discharge. (RE 33-3, Sneed Dep. Ex.3, Page ID # 819, 821; RE 25-2, Wright Decl. ¶ 23, Page ID # 225).  Their racial comments were also made directly and only to Plaintiffs.  Thus, the severity of the conduct was "greatly increased" due to Davis' and Claytor's roles as managers and since the slurs were "directed" squarely at Plaintiffs. *Johnson v. UPS*, 117 Fed. Appx. at 454; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763

(1998) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character.").  Given this context, PAM's argument that its supervisors' hostile and racial comments targeted only at Plaintiffs and accompanied by direct threats to their continued employment were "nothing more than 'mere offensive utterances'" is wrong. (PAM Brief at 36).

Additionally, PAM's discriminatory and abusive treatment of Plaintiffs was ongoing and continuous throughout their employment.  Indeed, despite their repeated complaints to management about it, "[N]othing was ever done . . . because it kept going on." (RE 33-1, Smith Dep. 64-65, 77-79, Page ID # 464-65, 477-79; RE 33-2, Sneed Dep. 109-11, 119, Page ID # 619-21, 629).  Such "'comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive' and evidence of an objectively hostile work environment." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 505 (6th Cir. 2021) (quoting *Hawkins*, 517 F.3d at 333).

PAM next incorrectly argues that "Plaintiffs have failed to meet their burden of showing the alleged harassment was pervasive enough to alter the conditions of their employment." (PAM Brief at 36-37).  Plaintiffs presented evidence that Davis' and Claytor's discriminatory conduct, comments, threats, and behavior interfered with their job performance, made it more difficult for them to perform their jobs, and caused them embarrassment, humiliation, and anxiety. (RE 33-1, Smith Dep. 56-59, 95-97, Page ID # 456-59, 495-97; RE 33-2, Sneed Dep. 132-35, Page ID #

17

642-45). They "'need not prove that [their] tangible productivity has declined as a result of the harassment. The[y] . . . need only show that the harassment made it more difficult to do the job.'" *Williams v. GMC*, 187 F.3d 553, 567 (6th Cir. 1999) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988)). Further, the "harm does not have to be 'significant' or 'serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar.'" *McNeal*, 117 F.4th at 900 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)). Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that the discriminatory harassment was severe or pervasive enough to create a hostile work environment. *Johnson*, 13 F.4th at 506 ("the district court erred in granting summary judgment to [defendant] on the severe or pervasive prong of [plaintiff]'s claim because there is sufficient evidence in the record that [supervisor]'s racial harassment was severe or pervasive enough for a reasonable person to find the work environment hostile.").

## IV.    PAM is Liable for the Discriminatory Harassment Plaintiffs Suffered

Finally, PAM's argument that "Plaintiffs failed to prove the fifth element of hostile work environment because they cannot show that PAM knew or should have known about the harassment and failed to act"—while not addressed by the district court—is incorrect. (PAM Brief at 38-42). This argument was fully addressed and dispatched in Plaintiffs' principal brief. (*See* Pls' Brief at 11-17, 45-51). In

summary, Plaintiffs presented evidence that they repeatedly complained to multiple managers about the discrimination and harassment to which Davis and Claytor subjected them. (*Id*. at 11-14, 48).   PAM admittedly failed to conduct any investigation or take any corrective action in response, allowing its supervisors' harassment to continue and rendering it liable. (*Id*. at 14-15, 46-47).

Contrary to its argument, PAM cannot avail itself of the *Faragher/Ellerth* affirmative defense because Plaintiffs suffered tangible employment actions, including Sneed's discharge and Smith's constructive discharge.  Even if the defense were available, PAM did not exercise reasonable care to prevent and promptly correct the harassment, and Plaintiffs did not unreasonably fail to take advantage of preventive or corrective opportunities provided. (*Id*. at 45-51).  Accordingly, PAM is liable.

## CONCLUSION

For the reasons discussed above and in Plaintiffs' and the EEOC's principal briefs, Smith and Sneed respectfully request that the Court reverse the judgment of the district court on their hostile work environment claims.

Respectfully submitted,


s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
5115 Maryland Way
Brentwood, Tennessee 37027
(615) 742-5900
doug@janneylaw.com

s/Stephen W. Grace
Stephen W. Grace, (TN BPR No. 14867)
1019 16th Avenue, South
Nashville, Tennessee 37212
(615) 255-5225
sgrace@sgracelaw.com

*Counsel for Appellants*


# CERTIFICATE OF COMPLIANCE

This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,576 words according to Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

s/Douglas B. Janney III
Douglas B. Janney III

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this Reply Brief of Appellants Smith and Sneed using the Court's CM/ECF system upon M. Reid Estes, Jr., and Autumn L. Gentry, Dickinson Wright PLLC, 424 Church Street, Suite 800, Nashville, Tennessee 37219 on December 20, 2024.

s/Douglas B. Janney III
Douglas B. Janney III