RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0264p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────



THOMAS MICHAEL SMITH; MONALETO SNEED,

*Plaintiffs-Appellants*,

*v.*

P.A.M. TRANSPORT, INC.,

*Defendant-Appellee*.

No. 24-5549

───────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:21-cv-00262—Eli J. Richardson, District Judge.

Argued:  March 18, 2025

Decided and Filed:  September 25, 2025

Before:  COLE, STRANCH, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Douglas B. Janney, III, JANNEY LAW, Brentwood, Tennessee, for Appellant. Autumn L. Gentry, DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee.  Tara Patel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.  **ON BRIEF:**  Douglas B. Janney, III, JANNEY LAW, Brentwood, Tennessee, Stephen W. Grace, GRACE LAW, Nashville, Tennessee, for Appellant.  Autumn L. Gentry, M. Reid Estes, Jr., DICKINSON WRIGHT PLLC, Nashville, Tennessee, for Appellee.  Tara Patel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae.

STRANCH, J., delivered the opinion of the court in which COLE, J., concurred, and READLER, J., concurred in part and in the judgment.  READLER, J. (pp. 22–24), delivered a separate concurring opinion.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge.  Plaintiffs Thomas Michael Smith and Monaleto Sneed bring this action against their former employer, P.A.M. Transport, Inc. ("P.A.M. Transport"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and the Tennessee Human Rights Act (THRA).  Plaintiffs assert that their supervisors at P.A.M. Transport created a racially hostile work environment.  The district court granted summary judgment to P.A.M. Transport on the ground that Plaintiffs failed to adduce evidence of racial harassment sufficient to sustain a viable hostile work environment claim.  For the reasons set forth below, we **REVERSE** the judgment of the district court.

## I.  BACKGROUND

### A.  Factual Background[1]

P.A.M. Transport is a trucking company with approximately 2,600 employees.  Thomas Michael Smith and Monaleto Sneed are African Americans[2] who were employed by P.A.M. Transport as truck drivers and stationed at the company's Whites Creek location in Nashville, Tennessee.  Smith served as a local driver from October 24, 2018, through April 23, 2019.  Sneed was first hired by P.A.M. Transport on February 8, 2019, as an over-the-road driver, which required him to transport freight across the country.  On April 10, 2019, he was transferred, at his request, to a local driver position based out of the Whites Creek location, where he continued to work until April 16, 2020.  At Whites Creek, both Sneed and Smith were under the supervision of driver manager Jermaine Davis.  Davis, who is also African American, reported to operations manager Jordan Claytor, who is white.  Like most of the Whites Creek drivers, Smith and Sneed were designated as Texas Regional Relay ("TRR") drivers.  TRR is a relay network created to transport freight from Laredo, Texas to various points in the United

_____

[1]We relay the facts, which are heavily disputed, in the light most favorable to Plaintiffs, as required at the summary judgment stage.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[2]Plaintiffs use the term "African American" in their complaint and briefing materials.  We follow their lead and do the same in this opinion.

States using a network of trucks. TRR drivers are paid at a daily rate regardless of hours on the road or distance driven.

According to Smith and Sneed, P.A.M. Transport required them to work more hours than their non-African American counterparts for the same pay. Smith testified that he was assigned, relative to his non-African American coworkers, lengthier routes with longer wait times, which caused him to work nearly 70 hours per week. According to Smith, he would complain about his longer work hours directly to his supervisors, who would tell him "that's part of it" and "just do the job." R. 33-1, Smith Dep., PageID 474. Sneed testified that he often had to drive two loads per day to Horse Cave, Kentucky—a two-hour, one-way drive from Whites Creek—whereas another local driver, Melvin, who is white, only had to drive one load per day to Horse Cave. Sneed also claims that white drivers received vacation time and holiday pay, whereas he did not.

Smith and Sneed claim that their supervisors often targeted them with pejorative remarks.[3] For example, Smith testified that, when he and Davis communicated, Davis would "use[]" the terms "monkey" and "monkey ass." R. 33-1, PageID 446-47, 454. Sneed similarly testified that Davis told him to "get [his] monkey [ass] out there and do the job," and that Claytor, "like [Davis]," also "used" the terms "monkey" and "monkey ass" when they interacted.[4] R. 33-2, Sneed Dep., PageID 663-65. These insults were alleged to have been accompanied by other forms of negative treatment. Smith testified that Davis would speak to him in a hostile and demeaning manner, criticize him, and threaten to terminate or withhold pay from him. Sneed also testified that Davis and Claytor would criticize, threaten, scream at, and curse at him. Smith and Sneed did not observe or hear about any instances in which their non-African American coworkers received similar verbal abuse. Both testified that the demeaning

---

[3]Smith testified that he generally interacted with his supervisors by phone, while Sneed testified that most, though not all, of his interactions with his supervisors were over the Qualcomm messaging system installed in P.A.M. Transport's trucks.

[4]Although the parties agree that Smith and Sneed testified that their supervisors called them "monkey ass," they disagree on whether Smith and Sneed also testified that their supervisors used the term "monkey." For purposes of summary judgment, we construe the record in the light most favorable to Plaintiffs, and that record supports the proposition that Smith and Sneed testified to the use of both terms. *See* R. 33-1, Smith Dep., PageID 447 (testifying that Davis "used the [term] *monkey* – monkey A[ss]" (emphasis added)); R. 33-2, Sneed Dep., PageID 665 (testifying that Claytor, like Davis, "used *monkey* . . . [m]onkey ass, they used that" (emphasis added)).

treatment hurt their morale, caused them significant anxiety and fatigue, and made it more difficult for them to do their jobs.

Smith claims that he repeatedly reported Davis's conduct to James Brown, a driver liaison who has since passed away, by telephone.  Driver liaisons act as intermediaries between drivers and driver managers, assist with driver issues, and provide driver counseling.  Brown would purportedly tell Smith that Davis's behavior "shouldn't be going on" and that he would "check into it," but the alleged misconduct persisted.  R. 33-1, PageID 477-78.  Sneed similarly testified that he reported Davis and Claytor's misconduct to various driver liaisons and managers in person, by telephone, and via the Qualcomm system installed in P.A.M. Transport's trucks.  These driver liaisons and managers included Brown, Tyrone Luckett, and Keith Coatney, all driver liaisons, as well as their manager Fred Meek.  According to Sneed, nothing was done to stop the misconduct.

Smith, "fed up with the working conditions," voluntarily resigned his employment on April 23, 2019.  R. 33-1, PageID 459.  He departed in good standing.  Sneed, however, was fired.  Sneed received mixed performance reviews during his employment, the final two of which were largely negative and mentioned, among other things, his leaving early and refusing loads.  The proffered reason for Sneed's termination, in turn, was performance issues, specifically for "refusing loads" and "leaving in the middle of a shift," which Sneed denies doing.  R. 33-4, Wright Dep., PageID 860**.**  Davis, with Claytor's support, made the recommendation to terminate, and it was ultimately Luckett who dismissed Sneed.  Sneed was never formally disciplined prior to his termination.

### B. Procedural Background

On March 26, 2021, Smith and Sneed sued P.A.M. Transport, asserting claims of race discrimination, retaliation, and hostile work environment, in violation of Title VII, 42 U.S.C. § 1981, and the THRA.  Sneed brought his claims under Title VII, 42 U.S.C. § 1981, and the THRA, while Smith brought his claims under § 1981 only.

P.A.M. Transport moved for summary judgment on all claims on May 9, 2022.  Two years later, on May 9, 2024, the district court granted P.A.M. Transport summary judgment on

all Plaintiffs' claims. Plaintiffs timely appealed. On appeal, Plaintiffs challenge only the district court's grant of summary judgment as to their hostile work environment claim and abandon their race discrimination and retaliation claims. The Equal Employment Opportunity Commission filed an amicus brief and participated at oral argument in support of Plaintiffs.

## II. ANALYSIS

The district court had federal question jurisdiction to hear this case under 28 U.S.C. § 1331. Smith and Sneed, in turn, appeal the district court's final judgment, conferring this court with jurisdiction to hear the appeal under 28 U.S.C. § 1291.

We review a district court's order granting summary judgment de novo. *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 559 (6th Cir. 2022). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). The court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020). A nonmovant's testimony, even if self-serving, may be sufficient to defeat a motion for summary judgment unless it is demonstrably false or totally implausible. *See Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020).

Under Title VII, a plaintiff may establish a prima facie case of a racially hostile work environment by demonstrating that "(1) [he] was a member of a protected class; (2) [he] was subjected to unwelcome [] harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with [his] work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). The same legal framework applies to hostile work environment claims brought pursuant to § 1981 and the THRA. *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (explaining that Title VII and § 1981 are reviewed under the same standards); *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 n. 1 (6th Cir. 2008) ("The analysis of claims brought pursuant to the THRA is identical to the analysis used for Title VII claims."). Although

there is no dispute that Plaintiffs are part of a protected class, the parties contest the last four elements.

### A. Evidence of Racial Harassment

A plaintiff may show that unwelcome harassment occurred and was based on race, and thereby satisfy the second and third elements, by adducing evidence of the use of race-specific and derogatory terms, or comparative evidence of how the alleged harassers treated members of both races in a mixed-race workplace. *See Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021). In the present case, Plaintiffs' evidence consists of testimony that their supervisors called them "monkey" and "monkey ass" and subjected them to mistreatment that their white counterparts did not experience. Although the district court found that at least some of this testimony constituted evidence of harassment, it nonetheless held that the evidence was insufficient to show that such harassment was race-based.

### 1. Use of the Terms "Monkey" and "Monkey Ass"

We begin with Plaintiffs' testimony that their supervisors called them "monkey" and "monkey ass." The district court held that the use of these terms does not constitute evidence of racial harassment. It first determined that "monkey" and "monkey ass" are not plainly racist terms, and any conclusion that they were used in a racially motivated manner here "can be drawn—if at all—only by inference." R. 43, Mem. Op., PageID 1002. Second, the court held that Plaintiffs failed to point to any evidence tending to show that their supervisors used the terms to refer only to African American employees. *Id.* at PageID 1028. The district court also stated that any potential racism attached to the terms was further diminished because one of the two alleged perpetrators, Davis, "was himself African American." *Id.* at PageID 1003.

The term "monkey" has an extensive history as a racial slur against African Americans. We have recognized that, "[g]iven the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is [] reasonable—perhaps even [] obvious"—to conclude that the invocation of the term "monkey" against an African American is "intended [as a] racial insult." *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998). Our sister circuits have been similarly forthright about the term's racial

valence. As the Fourth Circuit has explained, the "use of the word 'monkey' to describe African Americans" carries "similar[] odious[ness]" as the use of the word "n----r," which is "pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). "To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme." *Id.*

Consequently, circuit courts, including our circuit, have overwhelmingly held that the use of the term "monkey" against an African American employee constitutes evidence of race-based harassment sufficient to support a hostile work environment claim. For example, we have found evidence of racial harassment where, among other things, African American firefighters were assigned to workstations labeled "Monkey Island." *Jordan v. City of Cleveland*, 464 F.3d 584, 596-97 (6th Cir. 2006). The Second Circuit, meanwhile, has held that the "use of the word 'monkey' or derivative terms" within the workplace is "odious" and "constitutes compelling evidence of a racially hostile work environment." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 266 (2d Cir. 2023). The Third Circuit has similarly held that the term "monkey," when directed at an African American individual, was "clear[ly] . . . used in a racist manner." *Kengerski v. Harper*, 6 F.4th 531, 539-40 (3d Cir. 2021). The Eighth Circuit has also recognized that "[t]he use of the term 'monkey' and other similar words have been part of actionable racial harassment claims across the country." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006). As has the Eleventh Circuit. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297-98 (11th Cir. 2012) (holding that the use of the term "monkey" and the invocation of monkey-related imagery constitute evidence of racial harassment). All these circuit court cases reach the same conclusion—the word "monkey" and its derivatives are racist terms.

Based on well-established precedent across multiple circuits, Plaintiffs' testimony that Davis and Claytor called them "monkey" and "monkey ass" constituted evidence of race-specific harassment. There is "no benign explanation" in the record as to why Plaintiffs' supervisors would have directed these specific terms at them. *Id.* at 1297.

In holding otherwise, in part on the ground that the terms' racist nature "can be drawn . . . only by inference," R. 43, PageID 1002, the district court misread Supreme Court and

Sixth Circuit precedent. We have previously stated that a "plaintiff may prove that harassment was based on race" by pointing to "*direct evidence* of the use of race-specific and derogatory terms." *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis added). The district court construed the language in *Williams* as imposing a literal "direct evidence" requirement. R. 43, PageID 1002, 1027-28. That language, however, is derived from *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998). There, the Supreme Court explained that "sex-specific and derogatory terms" can constitute evidence upon which "[a] trier of fact might reasonably find" sex-based harassment. *Id.* at 80. The Court did not hold that such terms must be, on their face, explicitly or unquestionably sexist, such that no inference is necessary to conclude that the terms constitute sex-based harassment. Rather, it explained that evidence of the use of such terms need only raise "an inference of discrimination on the basis of sex" to support a finding of sex-based harassment. *Id.* That makes good sense—after all, the discriminatory nature of a term is necessarily dependent on the "social context in which particular behavior occurs and is experienced by its target." *Id.* at 81.

The Supreme Court's holding and reasoning apply to our jurisprudence on race-based harassment, including this case. *See Strickland*, 995 F.3d at 503 (citing *Oncale* for the proposition that race-specific and derogatory terms can constitute evidence of race-based harassment). The term "monkey" and its derivatives, while not overtly racial in isolation, have a long and well-understood history as racial slurs when directed at African Americans. *See, e.g.*, *Spriggs*, 242 F.3d at 185. In this case, two African American plaintiffs have testified that their supervisors directly and repeatedly called them "monkey" and "monkey ass." The use of the terms in that context raises a reasonable "inference of discrimination on the basis of" race. *Oncale*, 523 U.S. at 80. That suffices to show race-based harassment at the summary judgment stage. The district court's determination that Plaintiffs' testimony about the use of these terms does not constitute "evidence of the use of race-specific and derogatory terms," therefore, was plainly incorrect. R. 43, PageID 1028 (quotation omitted).

Resisting this clear conclusion, P.A.M. Transport claims that Plaintiffs are improperly attempting to "conflate" the terms "monkey" and "monkey ass" "so that Plaintiffs can rely upon their numerous cited discrimination cases discussing the term 'monkey'" in support of their

argument that "monkey ass" is a racial epithet.  Appellee Br. 30 n.12.  This argument is frivolous.  P.A.M. Transport offers no reason—and we can think of none—as to why the addition of the word "ass" somehow obviates the racialized nature of the term "monkey."  To the contrary, the "use of the term 'monkey' *or* derivative terms" against African Americans constitutes compelling evidence of racial harassment.  *Banks*, 81 F.4th at 266 (emphasis added).  Simply put, there is no meaningful difference between the terms "monkey" and "monkey ass" when used by a supervisor against an African American employee, as alleged here.[5]

Contrary to the reasoning of the district court, moreover, the racist nature of the terms "monkey" and "monkey ass" is not automatically obviated simply because one of the two alleged speakers is African American.  Our circuit has recognized that "Title VII can be violated by members of the same race or sex as the victim of discrimination."[6]  *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 513 (6th Cir. 2001).  To be sure, in some contexts, the fact that the alleged perpetrator is within the same protected class as the alleged victim may be material.  But on this record, we see no fact or reason why Davis's race undermines the conclusion that a reasonable jury could find his (and his supervisor's) alleged use of "monkey" and "monkey ass" to be racially derogatory.

---

[5] The concurrence cites a ChatGPT inquiry asking, "What does monkey ass mean?"  Conc. op. at 22.  ChatGPT functions as a consolidator of information, synthesizing patterns from a vast body of text, but it does not independently verify the accuracy of any material or its unknown sources.  The information provided in the concurrence's permalink to Urban Dictionary speaks for itself.

[6] The concurrence cites two articles when discussing "Black-on-Black" racism.  Conc. op. at 22.  Both are explanatory of and not contradictory to the existence of race-on-race discrimination.  Ultimately, this issue is controlled by black-letter law.  As the EEOC's workplace guidance makes clear, "[h]arassment that is based on the complainant's protected characteristics is covered [by Title VII] even if the harasser is a member of the same protected class (intraclass harassment)."  U.S. Equal Emp. Opportunity Comm'n, Enf't. Guidance on Harassment in the Workplace (Apr. 29, 2024), https://www.eeoc.gov/laws/guidance/enforcement-guidanceharassment-workplace [https://perma.cc/BC6U-VQ7C].  And the Supreme Court has provided guidance as to how Title VII (and all of its protected categories) function.  *See Onacle*, 523 U.S. at 79-80.  In *Onacle*, the Court rejected a categorical rule excluding same-sex harassment claims, explaining that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Id.*  Title VII, which prohibits employment discrimination against employees and applicants based on race, sex, color, religion, or national origin, was held to prohibit sexual harassment "of any kind that meets the statutory requirements."  *Id.*; 42 U.S.C. § 2000e-2(a)(1).  Thus, Title VII covers harassment between persons of the same sex and similarly prohibits discrimination between persons of the same race.  *See id.*  This principle has also been upheld by other circuit courts.  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 908 (7th Cir. 2018) (rejecting "entirely" the claim that it "strains credulity" for African Americans to face race-based harassment in workplaces with many African American managers and further noting that women and minorities may tolerate or even participate in discrimination against members of their own class) (citation omitted)).

Nor were Plaintiffs required to adduce evidence tending to show that Davis and Claytor used the terms only to refer to African American employees, as the district court suggested. Plaintiffs have testified that Davis and Claytor directly called them "monkey" and "monkey ass," and nothing in their testimony or in the broader record indicates that Davis and Claytor also directed the slurs at non-African American employees. In sum, the evidence, viewed in the light most favorable to Plaintiffs, raises a genuine issue of material fact as to whether they experienced racial harassment. *See Jones*, 683 F.3d at 1297.

2. Comparative Evidence

In addition to the alleged racial slurs, Plaintiffs also point to their testimony about the generally unfavorable treatment they received from their supervisors relative to other local TRR drivers who are not African American.

a. *Race of the Relevant Comparators*

All three of Plaintiffs' claims before the district court relied, in part, on their testimony regarding their comparably unfavorable treatment. The district court, however, rejected this evidence at the outset, deeming it inadequate as a matter of law. The court reasoned:

> [B]ecause [Plaintiffs'] protected class is African American—as opposed to Black, importantly—the relevant comparators for [them] must be non-African American, which is not synonymous with being "white"; a person can be African American even if someone might characterize them as being "white" based on a subjective perception of how light-colored their skin may be. The undersigned is loath to say that a person cannot be African American—or otherwise have the heritage of African descent—merely because someone might characterize the person as "white." . . . Absent clear authority requiring him to do so, the undersigned will not countenance the outdated and scientifically, sociologically, and evidentially unsound notion that being African American and being perceivable by a particular plaintiff as "white" are mutually exclusive. . . . [W]hat will not suffice is the plaintiff[s'] mere assertion that [they] ha[ve] perceived unidentified people to be "white" (and thus supposedly not African American), which is all [they] ha[ve] done.

R. 43, PageID 981-83 (citations, emphasis, and footnotes omitted). Analyzing the race discrimination claim, the district court mused that Smith and Sneed failed to prove their prima facie case in part because their identified comparators were merely "white," which it determined

"is not synonymous" with "non-African American." *Id.* at PageID 981, 996 n.69 (emphasis omitted). Recognizing that each of Plaintiffs' claims relied on "the same facts," *id.* at PageID 950, the court applied that reasoning to the hostile work environment claim. It again rejected testimony that Davis and Claytor spoke to non-African American drivers more favorably on the ground that Plaintiffs failed to "establish[] a basis for personal knowledge about the race of the [proffered comparators]." *Id.* at PageID 1027. The district court also specified evidence that, in its view, is necessary to establish the comparators' race, such as an "averment" by the comparators self-identifying as African American or "an admission by the defendant-employer." *Id.* at PageID 983. The district court cited no caselaw or other legal authorities supporting its reasoning or these requirements. *Id.*

This reasoning is deeply flawed. It starts from the erroneous premise that "African American" and "Black"—and, in turn, "non-African American" and "white"—are rigid categories of identity that can never be used interchangeably. Contrary to that assumption, our Title VII jurisprudence on race discrimination governs, and we have often used "African American" and "Black" interchangeably and compared "African Americans" with "whites." *See, e.g., Barrett*, 556 F.3d at 507-09; *Alexander v. Local 496 Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 400- 03 (6th Cir. 1999); *United States v. City of Warren*, 138 F.3d 1083, 1094 & n.10 (6th Cir. 1998). Our caselaw reflects the basic reality that "[c]olor-based language denotes race in common parlance: [c]olor terms such as 'Black' and 'White' commonly designate specific racial groups." Vinay Harpalani, *Civil Rights Law in Living Color*, 79 Md. L. Rev. 881, 887-88 (2020). The district court attempted to justify its additional evidentiary requirements by pointing to Title VII's prohibition on discrimination based on skin color, reasoning that "discrimination based on color is distinct from discrimination based on race." R. 43, PageID 983 n.57; *see* 42 U.S.C. § 2000e *et seq.* But that distinction does not obviate our well-established caselaw recognizing "Black" and "white" as racial identities.

By relying on this narrow conception of racial identity, unadorned by legal precedent, the district court effectively imposed a heightened burden on Plaintiffs beyond what Title VII, § 1981, and the THRA require. Our circuit has never held that a plaintiff must proffer evidence of a comparator's racial self-identification or genetic composition to survive judgment in a Title

VII case.  To the contrary, we have routinely accepted, at summary judgment, plaintiff testimony of disparate, race-based treatment grounded in experience and perception.  For example, in *Logan v. Denny's, Inc.*, we found a plaintiff's testimony that her white coworkers were given more hours and treated with greater respect than she was sufficient to "create a factual dispute for purposes of surviving summary judgment as to whether similarly situated non-minority [employees] were treated more favorably than [the] [p]laintiff."  259 F.3d 558, 563, 573-74 (6th Cir. 2001).  This understanding accords with the rules of evidence.  A plaintiff may offer testimony based on personal knowledge, and such knowledge "may consist of what the witness thinks he knows from personal perception."  Fed. R. Evid. 602 & advisory committee's notes. The threshold for admitting testimony based on personal knowledge is "low."  *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990).

In this case, there is no dispute that Smith and Sneed had non-African American coworkers at Whites Creek.  Both indicated through their testimony that they discerned their fellow drivers' races from personal interaction.  P.A.M. Transport has not adduced evidence demonstrating that Plaintiffs' testimony is demonstrably false or totally implausible.  *Davis*, 951 F.3d at 750.  Thus, the testimony, which is admissible under Federal Rule of Evidence 602, suffices to establish the race of the relevant comparators for purposes of summary judgment.  *See* Fed. R. Evid. 602; *Logan*, 259 F.3d at 573-74.

In sum, the district court erred by disregarding Plaintiffs' comparative evidence based on its own narrow conception of racial identity, unsupported by any legal authorities.

### b. *Verbal Mistreatment*

We turn to the substance of the comparative evidence, which can roughly be separated into two buckets:  (1) verbal mistreatment and (2) unfavorable employment-related actions. Smith and Sneed testified that, in addition to using the specific racial slurs "monkey" and "monkey ass," Davis and Claytor were verbally abusive toward them.  According to Smith, Davis and Claytor frequently spoke to him in an aggressive and demeaning manner and threatened him with termination and the withholding of his pay.  And Sneed testified that Davis and Claytor would often curse at, scream at, and threaten him, making inappropriate and

aggressive comments like "get your ass up" and "I need another load out of your ass."  R. 33-2, PageID 635, 664-66.

Here, Plaintiffs assert that non-African Americans were not subjected to the same hostile and demeaning treatment, and they point in part to Smith's testimony that he consistently overheard Davis speak to non-African American drivers in a "more professional" manner.  R. 33-1, PageID 455.  As discussed above, the district court incorrectly rejected this testimony on the ground that Smith lacked personal knowledge that these comparator drivers were not African American.  The testimony, however, is grounded in Smith's personal interactions and observations, rendering it admissible under Federal Rule of Evidence 602.  Based on that testimony, a reasonable jury could find that Davis subjected Plaintiffs to verbal abuse while sparing non-African Americans from the same mistreatment.  *See Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 308-09 (6th Cir. 2016) (noting that a plaintiff can show discriminatory harassment with evidence "that the harasser treated" members of two groups "differently").  Such harassment, "when viewed against the backdrop of . . . comparator evidence," can be "reasonably tie[d]" to a plaintiff's race.  *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 686 (6th Cir. 2024).

In addition, as discussed below, Davis and Claytor's alleged criticisms, cursing, threats, and shouting must also be considered in conjunction with their purported use of racial slurs.  "[F]acially neutral abusive conduct can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct."  *Jordan*, 464 F.3d at 596 (alteration in original) (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)).  Here, given the alleged use of racial slurs by Davis and Claytor, a reasonable jury could infer that the accompanying (purportedly race-neutral) verbal abuse by both individuals was, in fact, also racially motivated, without regard to Plaintiffs' testimony that non-African Americans received more favorable treatment.

The alleged verbal abuse by Plaintiffs' supervisors thus constitutes an additional piece of evidence of racial harassment, and the district court erred by rejecting it.

c.  *Unfavorable Employment-Related Actions*

In addition, Plaintiffs point to their testimony regarding unfavorable, employment-related treatment relative to their non-African American counterparts, including longer work hours for the same pay, lengthier routes, lack of vacation time, and older and more damaged trucks.[7]

P.A.M. Transport first contends that Smith and Sneed provided only limited argumentation on "whether [the] alleged evidence of extra loads, work assignments and excessive hours supports Plaintiffs' hostile work environment claims," and therefore waived the argument.  Appellee Br. 22.  That is simply wrong.  Plaintiffs extensively discuss their allegedly disproportionately long work hours and lengthy routes and the effect of that unfavorable treatment throughout their appellate brief, and they cite a legal basis for why that evidence is relevant to their hostile work environment claim.  Thus, Plaintiffs have raised this issue on appeal.

The district court categorically rejected Plaintiffs' evidence on the ground that it "is not the type of conduct that can even count toward the finding of a hostile work environment," because it "simply do[es] not constitute harassment (intimidation, ridicule, insult, and the like)."[8] R. 43, PageID 1024-25 (emphasis omitted).  But our circuit imposes no such blanket limitation. Rather, we have held that "discrete [employment-related] act[s] may contribute to . . . different and continuing harm[s]—for example, the pervasive humiliation of an employee," and in those circumstances, the "ancillary impacts may be considered in a hostile-work-environment claim." *McNeal v. City of Blue Ash*, 117 F.4th 887, 902 & n.14 (6th Cir. 2024).  Here, Smith and Sneed testified that their comparatively unfavorable work arrangements were part of a continuing string of hostile treatment that, like the verbal abuse, contributed to their feelings of anxiety, fatigue,

---

[7]Plaintiffs also raise, for the first time on appeal, Sneed's testimony that he was denied holiday pay, whereas his non-African American colleagues were given holiday pay.  Because Plaintiffs did not raise this issue before the district court, we do not consider it on appeal.  *See United States v. Ellison*, 462 F.3d 557, 560 (6th Cir. 2006).

[8]The district court framed this category of evidence as an allegation that Plaintiffs "were paid less (relative to the amount of work completed) than their non-African American counterparts."  R. 43, PageID 1023.  But Plaintiffs' claim regarding disparate, employment-related treatment was more expansive; it included, among other things, allegations that they worked longer hours, drove lengthier routes, and received older and more damaged trucks.

and diminished morale. The "ancillary impacts" of that treatment are relevant to our determination of whether Plaintiffs experienced a racially hostile work environment, and the district court erred in holding otherwise. *Id.*

P.A.M. Transport attempts to discount Smith and Sneed's testimony regarding unfavorable employment-related treatment, arguing that it is either inadmissible hearsay or speculation or contradicted by other portions of the record. As an initial matter, the governing standard requires us to review the evidence in the light most favorable to Smith and Sneed—we cannot discount their testimony wholesale solely because certain portions of it may be inadmissible or stand in tension with countervailing evidence proffered by P.A.M. Transport. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

Indeed, P.A.M. Transport is incorrect that Plaintiffs' evidence largely consists of inadmissible hearsay and speculation. As we have explained, where a plaintiff "has sufficiently proffered that . . . hearsay evidence of [a] co-workers' statements will be produced in an admissible form, i.e., through their direct testimony, at trial, we can consider what would otherwise be inadmissible hearsay evidence." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 424 n.8 (6th Cir. 2021). Parts of Plaintiffs' testimony could be admissible at trial and can therefore be considered at summary judgment. For example, testimony regarding the longer hours and lengthier routes is based on Plaintiffs' personal observations and their conversations with at least one named and identifiable coworker, Melvin, who could testify at trial.[9]  *See, e.g.*, R. 33-2, PageID 600 (testimony from Sneed that Melvin "would do one load to Horse Cave" per day, whereas he would do two); *id.* at PageID 646 (testimony from Sneed that he saw non-African American drivers "go home" while he "would have another trip to Horse Cave"); *accord* R. 25-3, Route Records, PageID 228 (document confirming that an individual named "Melvin" worked at P.A.M. Transport). Supervisors' statements recounted by Smith and Sneed seemingly acknowledging their complaints regarding this disproportionate workload also constitute admissible, non-hearsay evidence.

---

[9]In addition, to the extent Melvin's statements to Plaintiffs pertained to his own pay and workload, those statements likely constitute admissible non-hearsay under Federal Rule of Evidence 801(d)(2)(D), which excludes from hearsay statements offered against an opposing party "made by the party's . . . employee on a matter within the scope of that relationship and while it existed."

P.A.M. Transport is also incorrect in its claim that virtually all of Smith and Sneed's testimony regarding unfavorable treatment is blatantly contradicted by other record evidence. Although P.A.M. Transport points to documentary evidence purportedly showing that TRR drivers at Whites Creek drove similar routes and were assigned a similar number of loads per day on average, a facial review of the document does not clearly show that Smith and Sneed worked the same hours and drove the same routes as their non-African American counterparts.[10] Similarly, Plaintiffs' contention that they received more damaged trucks is not blatantly contradicted by P.A.M. Transport's records showing that most Whites Creek drivers, including Plaintiffs, received trucks that were the same age—damage, after all, is distinct from age.[11]

The district court's determination that Sneed's allegations of unfair treatment were "plainly contradicted" by other portions of his testimony was similarly inaccurate.  R. 43, PageID 986.  Specifically, the court saw an apparent discrepancy between Sneed's concession that he was not "sure" whether all drivers at his job were paid the same and his testimony that other, non-African American drivers, including Melvin, told him they were paid the same as him despite doing less work.  *Id.*  But those two portions of testimony are not clearly contradictory; Sneed could retain some uncertainty about his colleagues' exact pay, even if certain coworkers indicated to him that they made the same amount of money but worked fewer hours.  Indeed, P.A.M. Transport has attested that TRR drivers were paid at the same daily rate.  By disregarding Sneed's testimony on this basis, the district court failed to view the evidence in the light most favorable to Plaintiffs.

Smith and Sneed have therefore adduced evidence sufficient to raise a genuine issue of material fact as to whether they were required to work longer hours, drive lengthier routes, and use damaged trucks, unlike their non-African American counterparts.  A reasonable jury could

---

[10] The record purports to show, for each trip made by a TRR driver from October 2018 to April 2020, the start time and end time, the identity of the driver, the truck driven, and the various stages of the trip.

[11] P.A.M. Transport asserts that Plaintiffs waived their ability to argue that their purported receipt of damaged trucks constitutes evidence of hostile work environment because they failed to raise it in the section of their district court brief discussing hostile work environment.  But Plaintiffs did raise this specific argument in their district court brief, stating several times that they received damaged trucks as part of their contention that they were treated worse than their non-African American counterparts.  As the district court noted, the facts alleged by Plaintiffs undergirded all three of their claims.  Because Plaintiffs raised the issue below, it was not waived.

infer, from its racially disparate nature, that this unfavorable treatment was based, at least in part, on race. *See Schlosser*, 113 F.4th at 686-87. A reasonable jury could also find that at least some of this treatment "add[ed] to [the] climate of hostility" at P.A.M. Transport—causing Plaintiffs anxiety, fatigue, and demoralization—and thus constituted another piece of evidence of race-based harassment in support of Plaintiffs' hostile work environment claim. *McNeal*, 117 F.4th at 901; *see Smith*, 813 F.3d at 308-09. The district court erred in failing to consider this additional piece of evidence as part of its broader racial harassment analysis.

**B. Whether the Racial Harassment was Severe or Pervasive**

Having met the second and third elements, Plaintiffs must now meet the fourth by showing that the race-based harassment they experienced was "sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment." *Strickland*, 995 F.3d at 505 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Smith and Sneed must demonstrate "not only [that they] perceived the work environment as hostile, but that a reasonable person would have found it hostile or abusive as well." *Smith*, 813 F.3d at 309. "When assessing the hostility of a work environment, courts and juries consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Id.* (alterations in original) (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). Importantly, in assessing whether harassment was severe or pervasive, courts must evaluate "the 'work environment as a whole' rather than individual instances of harassment." *Id.* at 310 (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)).

We first address the decision below. After rejecting Smith and Sneed's contention that the term "monkey ass" sufficed to show race-based harassment, the district court held that "[e]ven assuming arguendo that 'monkey ass' implicates Plaintiffs' race (and thus satisfies the third element), Plaintiffs cannot establish that Defendant's alleged use of the term was sufficiently severe or pervasive to create a jury question on the fourth element." R. 43, PageID 1028. In doing so, the district court "[p]ut[] aside" Davis and Claytor's alleged use of "monkey ass" from the other testimony regarding verbal abuse. *Id.* at PageID 1026.

Our governing precedent, however, requires evaluation of the work environment as a whole, including the broader context in which the terms "monkey" and "monkey ass" were allegedly used. *See Smith*, 813 F.3d at 310. As noted, facially neutral abusive conduct, such as screaming, cursing, and threatening, "can support a finding of . . . animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly . . . discriminatory conduct." *Jordan*, 464 F.3d at 596 (alterations in original) (quoting *O'Shea*, 185 F.3d at 1097). By refusing to consider the use of the slurs in conjunction with the accompanying verbal abuse (or, for that matter, the unfavorable employment-related treatment) when assessing severity and pervasiveness, the district court relied on an incomplete picture of the harassment that Plaintiffs allegedly experienced.

We turn to the admissible evidence proffered by Plaintiffs. As discussed, Smith and Sneed testified that their supervisors called them "monkey" and "monkey ass" multiple times. Although P.A.M. Transport attempts to quibble with their testimony that they were "repeatedly" called "monkey" and "monkey ass," a fair reading of the testimony suggests that they were each called these terms multiple times. *See* R. 33-1, PageID 447, 454 (testimony from Smith that Davis "used the [term] monkey – monkey A[ss]"); R. 33-2, PageID 665 (testimony from Sneed that Claytor, like Davis, "used monkey . . . [m]onkey ass, they used that").

Nonetheless, our circuit has recognized that even a single incident of racial harassment, including the use of an egregious racial slur like the n-word, "may be so severe as to constitute a hostile work environment." *Reed v. Proctor & Gamble Mfg. Co.*, 556 Fed. App'x 421, 433 n.2 (6th Cir. 2014). Our sister circuits have also expressly found that a "one-time use" of an "egregious" epithet like the n-word "can in some circumstances warrant Title VII liability." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022); *accord Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) (finding a supervisor's one-time usage of the phrase "[l]azy [m]onkey [a]ss [n]----[r]" to an African American employee sufficient to state a claim for hostile work environment). Like the n-word, the term "monkey" is "odious" and "degrading and humiliating in the extreme" when used as an insult against African Americans. *Spriggs*, 242 F.3d at 185. That is particularly true in this case, where Smith and Sneed were purportedly called the term directly by their supervisors. The utterance of a slur by a manager "greatly

increase[s] its severity," and "harassment will be more severe if offensive comments were directed at a plaintiff." *Johnson v. UPS, Inc.*, 117 Fed. App'x 444, 454, 456 (6th Cir. 2004).

These circumstances distinguish this case from *Williams v. CSX*, relied upon by P.A.M. Transport, which deemed the use of the term "monkey" insufficient to show severe or pervasive conduct. 643 F.3d at 513. In *Williams*, the plaintiff's supervisor called Jesse Jackson and Al Sharpton "monkeys" and said that Black people should "go back to where [they] came from"— comments that were made one time over the course of two days and were not about the plaintiff. *Id.* at 506, 513.

In this case, by contrast, Smith and Sneed testified that they were directly called "monkey" and "monkey ass" by their supervisors on multiple occasions over time. Plaintiffs have also proffered evidence that, at least with respect to Sneed, the term "monkey ass" was used in an overtly threatening manner. For example, Sneed testified that Davis once told him, "you're going to get your monkey A-S-S out there and do the job or . . . I'm going to write you up." R. 33-2, PageID 663. Even standing alone, the evidence of these race-specific and derogatory terms very likely suffices to show severe or pervasive racial harassment.

We do not rely on the use of the slurs alone, however, because our governing cases require consideration of the totality of the circumstances in hostile work environment cases. *See Smith*, 813 F.3d at 309-10. As discussed, Smith and Sneed testified not only that they were directly called egregious, degrading, and humiliating racial slurs by their supervisors on several occasions, but also that they were subjected to sustained verbal use, in the form of threats, demeaning criticism, cursing, and screaming, while non-African American TRR drivers were spared from that same abuse. Plaintiffs also testified that they were consistently forced to work longer hours, drive lengthier routes with longer wait times, and use damaged trucks, unlike their non-African American counterparts. And both testified that the harassment caused them significant anxiety and diminished morale, which made it more difficult to drive on the road.

Viewing the totality of the record in the light most favorable to Plaintiffs, as we must, we conclude that a "reasonable person would have found [Smith and Sneed's work environment] hostile [and] abusive." *Id.* at 309. In turn, a reasonable jury could find, from the totality of the

evidence, that Smith and Sneed were subjected to recurring, severe, and humiliating racial harassment that unreasonably interfered with their employment. *See id.* The district court thus erred in concluding that the racial harassment was insufficiently severe or pervasive.

### C. Liability of P.A.M. Transport and Affirmative Defense

The fifth and final element of a hostile work environment claim is employer liability. *Smith*, 813 F.3d at 311. Although Smith and Sneed testified that they reported the harassment to officials at P.A.M. Transport, "employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment." *Barrett*, 556 F.3d at 516. Here, the parties agree that Davis and Claytor—the alleged perpetrators—had supervisory authority over Smith and Sneed. *See* Oral Argument at 19:14-19:52, 35:35-35:57 ("Q: Are you contesting that [Davis and Claytor] were supervisors . . . as a legal matter? A: We haven't. I don't see why we would do that now. . . . [T]hat is not something that we had an issue over."); *accord* R. 25-2, PageID 222 (attestation from P.A.M. Transport that "both Plaintiffs reported to Jermaine Davis"); R. 33-4, PageID 859 (testimony from P.A.M. Transport's corporate representative that Davis reported to Claytor). That suffices to establish the employer liability prong of Plaintiffs' prima facie case. *Barrett*, 556 F.3d at 516.

An employer can overcome that prima facie showing, however, by proving an affirmative defense establishing "(1) that it exercised reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the harm." *Id.* This affirmative defense is not available to employers when the victim has "suffer[ed] some tangible employment action, such as a demotion, discharge, or undesirable transfer." *Clark v. UPS, Inc.*, 400 F.3d 341, 348 n.1 (6th Cir. 2005).

Plaintiffs argue that P.A.M. Transport cannot avail itself of the affirmative defense because "Smith and Sneed suffered tangible employment actions when they were constructively and actually discharged, respectively, following the discrimination and harassment." Appellant Br. 46. But Smith and Sneed have abandoned their race discrimination and retaliation claims, which were based in part on their alleged constructive and actual discharge. Beyond cursory

averments that they were constructively and actually discharged in their appellate brief, Smith and Sneed do not attempt to relitigate those issues on appeal. Accordingly, this court lacks an adequate legal basis to conclude that Plaintiffs' alleged constructive discharge and actual discharge obviate P.A.M. Transport's ability to assert the affirmative defense.

Nonetheless, P.A.M. Transport has not proffered evidence sufficient, at the summary judgment stage, to meet the first prong of the defense. While it points to the fact that it gave Smith and Sneed a copy of its Anti-Discrimination and Harassment Policy, our caselaw makes clear that the existence and provision of a harassment policy alone are insufficient to show "reasonable care to prevent and correct promptly any racially harassing behavior." *Barrett*, 556 F.3d at 516; *see Clark*, 400 F.3d at 349. An employer must also show that the policy was reasonable and "effective in practice." *Clark*, 400 F.3d at 349. P.A.M. Transport points to no evidence, and does not even attempt to argue, that it had an effective policy. It makes no mention of the policy's "requirements" on supervisors or the "training regarding the policy"—both of which are baseline requirements for establishing the existence of a reasonable harassment policy. *Id.* at 349-50. The record also does not show that P.A.M. Transport took reasonable care to promptly correct the alleged harassment. To the contrary, Plaintiffs have testified that they placed P.A.M. Transport on notice of the harassment by reporting it to management-level employees, and P.A.M. Transport has proffered no evidence that it acted to promptly correct the situation. On this record, we cannot say that P.A.M. Transport "exercised reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor[s]." *Barrett*, 556 F.3d at 516. Because P.A.M. Transport has not met its burden of proving the first prong of the affirmative defense, it cannot prevail at summary judgment.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

———————————

## CONCURRENCE

———————————

READLER, J., concurring in part and in the judgment.  For many of the reasons put forward by the majority opinion, I agree that this case should be returned to the district court for further proceedings.  Reading the record in a light most favorable to them, Thomas Michael Smith and Monaleto Sneed were subjected to severe and pervasive harassment due to the race-specific and derogatory names their supervisors called them, "monkey" in particular.  What is more, Smith and Sneed allege that their supervisors coupled these names with threats while utilizing a hostile and demeaning tone.  Taken together, that is enough to overcome P.A.M. Transport's motion for summary judgment.

While I disagree with the district court's conclusion to the contrary, that court admittedly had difficult issues to address in the delicate setting of race discrimination.  Among them, how do we assess intent, context, and other relevant considerations in a setting where the individual who purportedly engaged in race discrimination is a member of the plaintiff's race?  *Compare* Theodore R. Johnson, *Black-on-Black Racism: The Hazards of Implicit Bias*, The Atlantic (Dec. 26, 2014), https://perma.cc/X8T9-8MKA, *with* George Yancy, *No, Black People Can't Be "Racists*,*"* Truthout (Oct. 20, 2021), https://perma.cc/ND6L-99WV.  Does the term "monkey ass," a phrase understandably not included in traditional dictionaries, have the same racial connotation as the term "monkey"?  *See Monkey Ass*, Urban Dictionary (last visited Sep. 22, 2025), https://perma.cc/RRF9-D7ZC (offering definitions such as "One who acts badly or stupid," "A stubborn child, esp[ecially] one that exhibits monkey-like traits (e.g. small, agile, and wild)," and "The resultant condition from prolonged periods of poor personal hygiene . . . ."); *see also* ChatGPT, "What does monkey ass mean?" (Sep. 23, 2025), https://perma.cc/SS32-JRUX (explaining that monkey ass can be "potentially racial (depending on context)" but also an "insult or put-down (non-specific)," "emphasizing someone acting wild or stupid," or "used in joking or aggressive banter" (citation modified)).  And is there daylight, for purposes of a race discrimination claim, between the terms "black" and "African American"?  *See Smith v. P.A.M. Transp., Inc.*, No. 21-cv-00262, 2024 WL 2097102, at *21 (M.D. Tenn. May 9, 2024)

(discussing the possibility that someone could be both African American and white); *see also* Carl Zimmer, *White? Black? A Murky Distinction Grows Still Murkier*, N.Y. Times (Dec. 24, 2014), https://www.nytimes.com/2014/12/25/science/23andme-genetic-ethnicity-study.html (describing how many individuals with African ancestry may not identify as black). As the opinions at all levels in this case reflect, fair-minded jurists can disagree over how to resolve these questions, which, in future cases, as here, will be influenced by the specific circumstances of the matter at hand.

As for the majority opinion, I would not reach the issue of whether Smith's and Sneed's comparative evidence is sufficient to avoid summary judgment. We need not do so, as we remand the case for trial on their separate theory that defendant's acts of subjecting Smith and Sneed to repeated, derogatory name-calling established a racially hostile work environment. Nor, as explained next, do I see the comparator claims as meritorious.

To that end, Smith and Sneed begin by alleging that their supervisors treated white drivers more favorably by assigning those drivers shorter routes. But the company's records refute the allegations. During the relevant period, its records reveal, drivers of all races were assigned similar routes.

The two likewise allege that white drivers were afforded better trucks. Yet the evidence on the point is scant. Smith, for his part, never testified that he drove a damaged truck. Nor is Sneed's testimony on the matter, which revealed no evidence that he was assigned particular trucks because of his race, the kind of evidence that "show[s] he was treated differently (and worse) than others" on account of race. *Smith v. City of Toledo*, 13 F.4th 508, 517 (6th Cir. 2021).

Next, Sneed claims that he was not given paid time-off, unlike white drivers. Again, that claim appears to be false. His paystubs show that the company paid him his accrued vacation time on March 12, 2020.

That leaves allegations that supervisors spoke to white drivers in a more professional tone and asked questions of Sneed that they did not ask of white drivers. Outside of his own conclusory assertions, however, Smith has not pointed to any evidence that the differences in

tone were based on race. And Sneed, for his part, admitted that he did not know whether white drivers were being asked the same questions. So once more, Smith's and Sneed's deposition testimony does not reflect "significantly probative" evidence that they were harassed because of their race. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Smith*, 13 F.4th at 517.

In the end, the comparative evidence proffered by Smith and Sneed does not stand up to scrutiny. Nor, again, is it necessary to rely on that evidence to reach today's conclusion, especially given the direct evidence of derogatory name-calling. *See Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000) ("Having met [the] summary judgment burden with direct evidence of discrimination . . . we need not consider whether there is also circumstantial evidence."); *Freeman v. Wainwright*, 959 F.3d 226, 230 (6th Cir. 2020) (observing that an opinion need not discuss "an issue beyond what the court must decide in that case").